Mary CHAWLA, et al., Plaintiffs,

v.

SHELL OIL COMPANY, Motiva Enterprises, L.L.C. and Equilon Enterprises, L.L.C., Defendants.

No. Civ.A. H–99–1711.

United States District Court, S.D. Texas, Houston Division.

Nov. 3, 1999.

George M. Flemming, Fleming & Associates, L.L.P., Houston, TX, Robert L. Steinberg, Paul B. Rosen, Jensen, Rosen & Steinberg, P.C., Houston, TX, Mike O'Brien, Mike O'Brien, P.C., Houston, TX, Jonathan S. Massey, Jonathan S. MAssey, P.C., Washington, DC, for Plaintiffs.

J. Gregory Copeland, J. Michael Baldwin, Baker Botts, L.L.P., Houston, TX, Ann Spiegel, Sr. Litigation Counsel, Equiva Services LLC, Houston, TX, for Defendants.

## MEMORANDUM OPINION AND ORDER

ATLAS, District Judge.

Pending before the Court are the Defendants' Motion to Dismiss the Tying, Price Discrimination, and Fraud Counts of Plaintiffs' First Amended Complaint ("Defendants' Motion") [Doc. # 11] and Defendants' Supplemental Motion to Dismiss Plaintiffs' Conspiracy Count [Doc. # 46]. The parties have fully briefed the issues.[1] The Court has considered all the parties' submissions, all matters of record, and the applicable authorities, and concludes that Defendants' Motion should be granted in part and denied in part, and the Defendants' Supplemental Motion should be granted.

## I. FACTUAL BACKGROUND

Defendants in this case manufacture and distribute Shell brand gasoline. Defendants distribute this gasoline to consumers through three different channels. First, Defendants directly own and operate retail stations, otherwise known as "company-owned stations" or "Shell-owned stations." Second, Defendants sell their fuel to wholesale "jobbers," who supply it to Shell-brand stations owned either by the jobber ("jobber stations") or other individuals under a contractual relationship with the jobber ("open dealers").[2] Third, De-

---

1. *See* Memorandum in Support of Plaintiff's Opposition to Defendants' Motion to Dismiss ("Plaintiffs' Response") [Doc. # 22]; Plaintiffs' Opposition to Defendants' Supplemental Motion to Dismiss Plaintiffs' Conspiracy Count [Doc. # 51]; Reply by Shell Oil Company to Plaintiffs' Opposition ("Defendants' Reply") [Doc. # 26]; Defendants' Reply to Plaintiffs' Opposition to Defendants' Supplemental Motion to Dismiss ("Defendants' Supplemental Reply") [Doc. # 53].

2. The term "jobber stations," as defined by Plaintiffs in the First Amended Complaint, at 10, ¶ 85, is the definition the Court uses throughout this opinion; Plaintiffs are expected to use this definition in the future in this case. The reference to "retail jobber stations" in Count III (*see id.* at 22, ¶ 155), is construed to mean "jobber stations" as defined in ¶ 85. Specifically, "jobber stations" are stations owned and supplied by jobbers. Defendants supply these jobbers with Shell brand gasoline in bulk wholesale transactions. These jobbers and jobber stations therefore are different from Plaintiffs, who also obtain their gasoline directly from Defendants but lease their stations from Defendants and do not distribute to any other dealers. *See id.* at 10, ¶ 85.

fendants own or lease certain real estate and then lease or sub-lease the property to independent business persons who become Shell brand "dealers," known as "lessee-dealers," who operate and run "lessee-dealer stations."

Plaintiffs in this case consist of seventy-three individuals who, directly or indirectly, are lessee-dealers that now operate or have operated Shell-brand gasoline stations. Each Plaintiff has a contractual relationship contained in a standard "Dealer Agreement," whereby the lessee-dealer agrees to sell exclusively Shell brand gasoline through the gas station.[3]

Plaintiffs allege that Defendants' actions have violated federal antitrust laws, as well as state fraud, tort, and contract laws. In their First Amended Complaint, Plaintiffs assert ten causes of action. First, Plaintiffs allege an illegal tying arrangement in violation of § 1 of the Sherman Act, 15 U.S.C. § 1 (Count I), and § 3 of the Clayton Act, 15 U.S.C. § 14 (Count II), challenging Defendants' "pay at the pump" program whereby Defendants require Plaintiffs to enable retail consumers to pay for gasoline at the gasoline pump by using equipment and services mandated by Defendants. Plaintiffs also allege that Defendants have engaged in illegal price discrimination between Plaintiffs and the jobbers with whom they compete in violation of the Robinson–Patman Price Discrimination Act amendment to § 2(a) of the Clayton Act, 15 U.S.C. § 13(a) (Count III). Plaintiffs also contend that Defendants' actions concerning the relative price charged to Plaintiffs and their retail competitors constitute a conspiracy affecting interstate commerce in violation of § 1 of the Sherman Act, 15 U.S.C. § 1 (Count IV). Plaintiffs also allege that Defendants fraudulently induced the Plaintiffs to enter into the Dealer Agreements or other agreements with Defendants (Count V). Last, Plaintiffs allege five other state law

claims arising from the parties' business relationship.[4] Defendants do not address Counts VI through X in their Motions. The claims in issue in the pending motions are described below in greater detail.

### A. *Counts I and II: Alleged Illegal Tying Arrangement in Violation of § 1 of the Sherman Act and § 3 of the Clayton Act*

Plaintiffs challenge Defendants' "pay at the pump" program. Plaintiffs claim they are being coerced by Defendants to lease "Island Card Readers" ("ICRs") and to agree to utilize the bank chosen by Defendants to process the associated credit card transactions. *See* Plaintiffs' First Amended Complaint, at 17, ¶¶ 125, 127. ICRs are the credit card readers placed on the gasoline pumps which allow customers to "pay at the pump." The ICRs are separate from the credit card machines operated by Plaintiffs inside their stations or convenience stores. *Id.* at 16, ¶ 124. The ICRs are operated in connection with banks selected by Defendants to process the transactions. *Id.* at 17, ¶ 127. Thus, the ICRs and Defendants' chosen bank operate together as one credit card processing system. In addition, Plaintiffs allege that Defendants' tying scheme was imposed on "most—if not all—Plaintiffs" only after Plaintiffs signed their Dealer Agreements. *Id.* at 16, ¶ 124.

Plaintiffs complain first about being required to lease ICRs and pay a monthly fee based on the number of ICRs at each station. *Id.* at 17–18, ¶ 130. Second, Plaintiffs complain that Defendants' fee is higher than the fee allegedly available if Plaintiffs were allowed to obtain the ICRs from another source. *Id.* at 17, ¶ 127. Third, as to the requirement that they use the bank chosen by Defendants to process ICR-related credit card transactions, Plaintiffs claim they could obtain less ex-

---

**3.** Plaintiffs each sue on their own; there are no class action allegations.

**4.** Specifically, Plaintiffs allege tortious interference (Count VI), breach of contract

(Counts VII and VIII), breach of duty of good faith and fair dealing (Count IX), and unfair competition (Count X).

pensive financing elsewhere. *Id.* at 18, ¶ 131.

Plaintiffs allege in Count I that Defendants' "practice of coercing Plaintiffs to agree to lease ICRs and forcing Plaintiffs to agree to utilize only Shell's chosen bank to process [these] credit card transactions" creates an illegal tying arrangement in violation of the Sherman Act, § 1. In this trying arrangement, the tying products are Shell brand gasoline and the Shell trademark, and the tied product is Defendants' selected bank for processing of transactions. *Id.* at 19, ¶ 138. Plaintiffs alternatively contend that "Shell's practice of coercing Plaintiffs to effectuate gasoline sales through ICRs and forcing [the use of] only Shell's chosen bank to process [these] credit card transactions" is another illegal tying arrangement. *Id.* at 19, ¶ 139. Plaintiffs generally allege these tying arrangements affect interstate commerce, because all Shell brand lessee-dealers are required to abide by the same arrangements. *Id.* at 19–20, ¶¶ 139, 140. Plaintiffs allege that this tying arrangement harms both lessee-dealers and consumers. Plaintiffs contend that Shell gasoline has unique additives and there is no alternative for consumers of Defendants' gasoline. *See Id.* at 19, ¶ 139. Defendants' tying arrangement thus harms consumers who bear the burden when the increased costs of Defendants' ICR policy is passed on to the consumer in higher priced Shell brand gasoline. *Id.* at 20, ¶¶ 139, 142. Plaintiffs deduce that Defendants thus have leverage power in "its branded gasoline and trademark" over Shell dealers because, from the independent lessee-dealers' perspective, there is no alternative to Shell gasoline. *Id.* at 20, ¶ 141.

In Count II, Plaintiffs allege that the tying product is "Shell's unique branded gasoline product, in which Shell has market power, and the tied product is ICRs which travel in commerce." *Id.* at 21, ¶ 147. Plaintiffs claim "Shell makes future sales of its branded gasoline contingent upon Plaintiffs' use of Shell's ICRs." *Id.* at 21, ¶ 148. Plaintiffs add that Shell has leverage power in its branded gasoline over independent Shell dealers, because from the independent Shell lessee-dealers' perspective, there is no alternative to Shell branded gasoline." *Id.* at 21, ¶ 149. Plaintiffs add that "this harms the ultimate consumer who must endure higher prices to get unique Shell gasoline product ... because the costs to Plaintiffs are increased." *Id.* at 21, ¶ 150.

The net effect, Plaintiffs allege in Counts I and II, is that the "tying arrangement is forcing Plaintiffs out of business, as they lose money if they accept the higher lease amount without passing the increase on to their customers, or they lose money by making fewer sales as customers frequent competing Shell gasoline stations which have lower gasoline prices and which are not restrained by Shell's illegal tying arrangements." *Id.* at 20–21, ¶ 145; at 22, ¶ 153.

## B. *Count III: Price Discrimination in Violation of the Robinson–Patman Act*

Plaintiffs allege that "beginning at least in 1995 and continuing to the present, Shell has engaged in the practice of giving jobbers a substantial and preferential discount on the price of Shell gasoline." Plaintiffs' First Amended Complaint, at 14, ¶ 111. Jobbers purchase Shell brand gasoline from the Shell terminal at a predetermined "rack price." *Id.* The independent lessee-dealers, on the other hand, purchase Shell gasoline directly from Shell at a "dealer tank wagon" ("DTW") price, which is greater than Shell's rack price. *Id.* These jobbers, Plaintiffs allege, sell this gasoline to jobber stations at a discounted price, which is lower than the price Shell charges Plaintiffs' stations. *Id.* at 14, ¶ 112. Plaintiffs allege that the difference constitutes a discriminatory sale within the meaning of the Robinson–Patman Price Discrimination Act amendment to § 2(a) of the Clayton Act, 15 U.S.C. § 13(a). *Id.* at 23, ¶ 161. Plaintiffs further allege that these discriminatory pricing practices have caused the "substantial lessening of competition" in the retail gasoline market as

between Plaintiffs and Defendants' "favored buyers." Plaintiffs' First Amended Complaint, at 23, ¶ 159. Plaintiffs claim impairment of their "ability to compete with Shell jobbers at the retail level ... resulting in lost sales and profits, as well as other damages, including being forced out of the Shell-branded gasoline market." *Id.* at 23, ¶ 160.

### C. *Count IV: Violation of § 1 of the Sherman Act*

In Count IV, the last federal law claim, Plaintiffs contend the Defendants have conspired with unspecified jobbers to keep Plaintiffs from purchasing fuel at competitive wholesale prices. Plaintiffs' factual allegations regarding price discrimination are essentially the same as those outlined above in Count III of Plaintiffs' First Amended Complaint. *See Id.* at 23–34, ¶¶ 163–165. In Count IV, however, Plaintiffs explicitly allege that the "relevant product market" is "Shell-branded gasoline." According to Plaintiffs, this product "is unique and defines its own relevant market due to the patented additives" included in this gasoline and due to Defendants' branded "credit cards that allow consumers holding those cards to charge gasoline at Shell stations." Plaintiffs' First Amended Complaint, at 24, ¶ 166. Plaintiffs alternatively argue that the "relevant product market for this cause of action is Shell-branded gasoline from the perspective of independent Shell lessee-dealers." *Id.* at 24, ¶ 167.

Plaintiffs then argue that the entire continental United States constitutes the relevant geographical market for their relevant product, Shell brand gasoline. *Id.* at 24, ¶ 168. Plaintiffs allege that "[o]ther relevant geographic markets, or sub-markets, for this cause of action are the geographic markets of each of the individual Plaintiffs' stations...." *Id.*[5]

Plaintiffs complain that Defendants have "sought to obtain or maintain monopoly market power within the U.S. Shell-branded gasoline market as well as each sub-market" (*Id.* at 25, ¶ 171), and have "used [their] market power to engage in discriminatory pricing of Shell-branded gasoline and to breach its duties owed to Plaintiffs under [their] contracts with Plaintiffs to quash competition and force independent dealers out of the Shell-brand gasoline market." *Id.* at 25, ¶¶ 172, 177. Plaintiffs in conclusory fashion allege that Defendants' conduct has "injured the relevant Shell-branded gasoline markets and each Plaintiff" (*Id.* at 25, ¶ 170), and have "unreasonably restrain[ed] trade in an anti-competitive manner" (*Id.* at 25, ¶ 173). Plaintiffs further contend that Defendants' officers and agents have "conspired" or "acted in concert and have entered into agreements with Plaintiffs, which restrain trade in an anti-competitive manner" (*Id.* at 25, ¶ 175), and have conspired with jobbers to restrain trade (*Id.* at 25, ¶ 176). Plaintiffs' counsel, in oral argument, stated that they assert a horizontal boycott of the lessee-dealers by Shell and the jobbers and, as such, they allege a *per se* violation of § 1 of the Sherman Act.

### D. *Count V: Fraudulent Inducement*

Plaintiffs allege that Defendants failed to disclose several material facts[6] which, if

---

5. Plaintiffs also allege that Defendants have "occupied a substantial share of the market and ha[ve] demonstrated an ability to unreasonably control and unreasonably influence prices available to the consuming public for Shell-branded gasoline." *Id.* at 24, ¶ 169. Moreover, allegedly, "Shell uses its market power to illegally manipulate its contractual relationships with Plaintiffs, thereby preventing competition in the relevant market." *Id.*

6. Examples of the allegedly false statements or material omissions, material facts are (1) that lessee-dealers would be allowed to operate as independent business persons able to set up their own "pool margins"; (2) allowing lessee-dealers to purchase Defendants brand of their gasoline from sources other than Shell at a discount; (3) allowing Plaintiffs to seek their own financing for ICRs with lower processing fees than those of Defendants; (4) failing to inform Plaintiffs "that they would be competing with jobbers/OD's and Shell owned and operated stores who can purchase Shell gasoline at wholesale prices while requiring Plaintiffs to purchase the same Shell gasoline at retail prices"; and (5) failing to inform Plaintiffs of the high "pre-printed

disclosed, would have resulted in the lessee-dealers not entering into relationships with the Defendants. *See id.* at 26, ¶ 182. Plaintiffs claim Defendants either knew the assertions were false when made or that they were made recklessly without knowledge of the truth. *Id.* at 26–27, ¶ 182. In addition, Plaintiffs allege that Defendants intended for Plaintiffs to rely on the misrepresentations to their detriment. As a result, Plaintiffs were fraudulently induced to sign the agreements that now govern Plaintiffs' relationships with Defendants. *Id.*

Defendants argue that Plaintiffs allegations are merely conclusory and do not satisfy the heightened pleading requirement for fraud allegations. Fraudulent allegations must be pleaded with particularity in accordance with FED.R.CIV.P. 9(b). Defendants note that no specific Plaintiff has alleged what misrepresentations were made to him or her, or specify how any misrepresentation was relied upon by Plaintiff to his or her detriment. Defendants state the purpose of the particularity requirement is to avoid meritless complaints. Defendants claim Plaintiffs' allegations ignore this requirement and therefore the First Amended Complaint should be dismissed.

At the Court's September 17, 1999, pretrial conference, Plaintiffs did not dispute the lack of specifics as to each Plaintiff but requested time to gather the necessary information. The Court orally ruled that Plaintiffs' fraud claim was insufficiently specific and therefore was legally insufficient as to each separate Plaintiff. Rather than require re-pleading in the complaint *per se*, the Court directed Defendants to serve interrogatories to which each Plaintiff must respond; these interrogatories are to elicit the necessary details as to each Plaintiff's fraud claims, standing, and other matters. On reflection, and in light of other rulings on Defendants' motions, the Court now concludes that Plaintiffs shall be required to file a second amended complaint with an appendix that addresses the claims of each Plaintiff separately, including *inter alia* the particulars of his or her fraud claim. The Court will address the sufficiency of the fraud claims when and if challenged by summary judgment motion at a later date.

### E. *Plaintiffs Other State Law Claims*

Plaintiffs also allege claims of tortious interference with a contract, breach of contract, breach of the duty of good faith and fair dealing and unfair competition. Defendants have not filed motions concerning these claims and issues concerning their sufficiency are not currently before the Court.

## II. *LEGAL STANDARDS FOR MOTIONS TO DISMISS*

■ Dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure is appropriate when, taking the facts alleged in the complaint as true, it appears certain that the plaintiff can prove no set of facts in support of its claim which would entitle it to relief. *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *C.C. Port, Ltd. v. Davis–Penn Mortgage Co.,* 61 F.3d 288, 289 (5th Cir.1995).[7] A court must limit its inquiry to the facts stated in the complaint and the documents either attached to or incorporated into the complaint; however, courts may also consider matters of which they may take judicial notice. *Lovelace v. Software Spec-*

---

rent" and/or explain how rent obligations would be calculated. *See* First Amended Complaint, at 26, ¶ 182.

**7.** The Supreme Court has indicated that in factually complex antitrust cases, district courts may require that facts be pleaded with reasonable particularity in order to permit an inference that a federal antitrust claim is cognizable. *See Associated General Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 526 n. 17, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) (finding that in a factually complex antitrust case, "a district court must retain the power to insist upon some specificity in the pleading before allowing a potentially massive factual controversy to proceed.").

*trum, Inc.,* 78 F.3d 1015, 1017–18 (5th Cir.1996). "In antitrust cases in particular, the Supreme Court has stated that 'dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly.'" *George Haug Co. v. Rolls Royce Motor Cars, Inc.,* 148 F.3d 136, 139 (2d Cir.1998) (quoting *Hospital Building Co. v. Trustees of Rex Hosp.,* 425 U.S. 738, 746, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976).) "Nonetheless, '[i]t is not ... proper to assume that the [plaintiff] can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged.'" *Id.* (quoting *Associated General Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)).

## III. *DISCUSSION*

### A. *Illegal Tying Arrangements*

#### 1. Summary

Plaintiffs allege that, in order to continue to supply Shell gasoline to Plaintiffs, Defendants illegally (i) require the use of ICRs, (ii) require the use of Defendants' specified ICRs, and (iii) require the use of Defendants' specified credit processing services for ICR transactions, all of which impose added costs on Plaintiffs (collectively, the "ICR policy"). Plaintiffs consistently allege that the tying products are Shell gasoline and the Shell trademark, and the tied products are Defendants' selected ICRs and/or credit processing services. *See* Plaintiff's First Amended Complaint, at 19–20, ¶¶ 138, 139. The ICR policy, Plaintiffs argue, violates both § 1 of the Sherman Act (Count I) and § 3 of the Clayton Act (Count II).

Defendants argue that Plaintiffs have not alleged all of the necessary elements

for an illegal tying claim. First, Defendants argue that Plaintiffs cannot show that Defendants have market power in the tying product, which Defendants contend is gasoline generally. Implicitly, Defendants contend that the "relevant market" is branded gasoline, rather than Shell brand gasoline. Second, Defendants emphasize that relationships arising from the Dealer Agreements at issue in this case do not create market power recognized under the antitrust law. Rather, Defendants contend they have contractual power over Plaintiffs. Last, Defendants contend that Plaintiffs have failed to allege an unreasonable restraint of competition in the tied product.

Plaintiffs respond to Defendants' Motion by contending that they have alleged all the necessary elements of an illegal tying agreement. First, Plaintiffs contend that "Shell-branded gasoline" constitutes the relevant market. Plaintiffs support this contention first by arguing that Shell gasoline, a product protected by the Shell trademark, is a unique product for which consumers are willing to pay a higher price than other gasoline. *See* Plaintiffs' First Amended Complaint, at 19, ¶ 139.[8] Alternatively, Plaintiffs argue that the individual lessee-dealers are "locked in" by the ICR policy. Plaintiffs point out that they were unaware of Defendants' plan to use ICRs when they entered into their Dealer Agreements, which by their nature are long term agreements. *Id.* at 16, ¶ 124.

Plaintiffs complain that Defendants' ICR policy invokes antitrust liability under the Supreme Court's rule announced in *Eastman Kodak Co. v. Image Technical Services, Inc.,* 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 ("*Kodak*") (1992). Last, Plaintiffs state generally that, if not

---

**8.** Plaintiffs appear to acknowledge that the case involves only branded gasoline, *see* Transcript of September 24, 1999 Conference, at 18–19. This concession is appropriate since it is clear that unbranded gasoline is a materially different product. *See C.E. Services, Inc. v. Control Data Corp.,* 759 F.2d 1241, 1246

(5th Cir.1985) (quoting *Brown Shoe v. United States,* 370 U.S. 294, 325, 82 S.Ct. 1502, 1523–24, 8 L.Ed.2d 510 (1962) (recognizing that "within [a] broad market, well-defined subdivisions may exist which ... constitute product markets for antitrust purposes")).

coerced by Defendants' tying arrangement, Plaintiffs would choose less expensive ICRs and processing services with more favorable rates. *See e.g.,* Plaintiffs' First Amended Complaint, at 20, ¶ 143. Plaintiffs contend they have sufficiently alleged an anti-competitive effect on the tied market.

The Court concludes that Plaintiffs have failed to state a legally cognizable claim of illegal tying. As to the alleged injury to Plaintiffs' lessee-dealers, the Court concludes that the tying arrangement arises from contractual provisions contained in Defendants' Dealer Agreement, and the *Kodak* doctrine is not applicable. Furthermore, the Court holds that Plaintiffs have failed to allege any anti-competitive effect on the market for the tied products, ICRs and related credit card processing services. As to the alleged injury to the retail gasoline consumers, the Court concludes that, as a matter of law, Shell gasoline is not a legally cognizable "relevant market." Therefore, Plaintiffs have not alleged that Defendants have market power in the tying product, and cannot state a claim under either the Sherman or Clayton Acts. The Court last concludes that, as to the retail gasoline consumers, Plaintiffs have failed to allege either an anti-competitive effect on the tied market or an illegal tie.

## 2. Legal Standards Governing Tying Arrangements

▆ Plaintiffs allege that Defendants' ICR policy is an illegal tying arrangement. A "tying arrangement" is one under which "a seller agrees to sell one product (the 'tying product') only on the condition that the buyer also purchase a second product (the 'tied product')," *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.,* 549 F.2d 368, 373 (5th Cir.1977), or that the seller sells the tying product only on the condition that the buyer "agrees that he will not purchase the product from any other supplier." *Eastman Kodak Co.,*

504 U.S. at 461, 112 S.Ct. 2072 (citation omitted). Thus, Defendants' ICR policy is a tie under federal law.

▆ However, not every tying arrangement is illegal. *See Jefferson Parish Hospital Dist. No. 2 v. Hyde,* 466 U.S. 2, 11, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984). "Such an arrangement violates § 1 of the Sherman Act if the seller has appreciable economic power in the tying product market and if the arrangement affects a substantial volume of commerce in the tied market." *Kodak,* 504 U.S. at 462, 112 S.Ct. 2072 (citation omitted). To show that a tying agreement is illegal, a plaintiff must demonstrate that the tie is either *per se* illegal or invalid under the rule of reason. *See* 9 PHILLIP E. AREEDA, ANTITRUST LAW § 1719a (1991) ("AREEDA"). To establish *per se* illegality, a plaintiff must show:

(1) two separate products (as opposed to components of a single product);

(2) that are tied together or the customers are coerced into buying;

(3) the supplier possesses substantial economic power over the tying product;

(4) the tie has an anti-competitive effect on the tied market; and

(5) the tie affects a not insubstantial volume of commerce.

*United Farmers Agents Ass'n, Inc. v. Farmers Ins. Exchange,* 89 F.3d 233, 236 n. 2 (5th Cir.1996) (*"United Farmers"*) (citing AREEDA, § 1702; *Kodak,* 504 U.S. at 461–62, 112 S.Ct. 2072; *Hyde,* 466 U.S. at 11–28, 104 S.Ct. 1551). If a plaintiff is unable to satisfy this test, the plaintiff nevertheless may be able to show that a tying arrangement is invalid under the "rule of reason." *Id.* Under this latter approach, a plaintiff has the burden of demonstrating that "the tying arrangement 'unreasonably restrained competition.' " *Id.* at 236 n. 2, 104 S.Ct. 1551 (citing *Hyde,* 466 U.S. at 29, 104 S.Ct. 1551).[9]

---

9. Because of its inquiry into market power, this test is actually "located between a per se and a rule of reason inquiry." *See Roy B.*

*Taylor Sales, Inc. v. Hollymatic Corporation,* 28 F.3d 1379, 1382 (5th Cir.1994).

A key element in most antitrust claims is ultimate harm to consumers. *See Queen City Pizza, Inc. v. Domino's Pizza, Inc.,* 124 F.3d 430, 441 (3rd Cir.1997) (Scirica, J.) ("*Queen City Pizza*") (recognizing that "[t]he purpose of the Sherman Act is not to protect businesses from the working of the market; it is to protect the public from the failure of the market"); *United Farmers,* 89 F.3d at 236 (rejecting plaintiff's antitrust claim because it "has nothing to do with ... ultimate consumers ..."); *Roy B. Taylor Sales, Inc. v. Hollymatic Corp.,* 28 F.3d 1379, 1382 (5th Cir.1994) ("[T]he antitrust laws protect competition, not competitors. Ultimately, the consumer is the beneficiary.").

### 3. Lessee–Dealers as Consumers

*Plaintiff's Allegations.*—To analyze a tying claim, the relevant product market for both the tying and tied products must be identified. *See Town Sound and Custom Tops, Inc. v. Chrysler Motors Corp.,* 959 F.2d 468, 479 (3rd Cir.1992) ("To determine the existence of market power for purposes of the 'per se' test, then, we must first define the relevant tying product market...."); *Queen City Pizza,* 124 F.3d at 441 (holding that plaintiffs had failed to adequately allege a tied product market).

Plaintiffs' definitions of the relevant products and markets for Plaintiffs as consumers vary slightly in Counts I and II. As to the *tying product* and markets, Plaintiffs variously allege that Shell gasoline and the associated Shell trademark are the tying products and argue that the relevant market is retail gasoline sales to the public, *i.e.* individual retail consumers; either in a national market or in the locale of each individual dealership. *See* Plaintiffs' First Amended Complaint, at 20, ¶ 142; at

21, ¶ 150. Plaintiffs also complain that in order to obtain continued supply of Shell gasoline, the necessary product for their Shell dealerships, Plaintiffs are locked in to the ICR policy, and have high costs of switching to a new product.[10] *See, e.g., id.* at 9–10, ¶ 84; at 17, ¶ 128 ("All facts indicate that ... Shell requires dealers to agree to use the single Shell-approved bank as a condition for continued purchase of Shell-branded gasoline and the use of the Shell trademark."); at 19–20, ¶¶ 131, 138, 139, 141; at 21, ¶¶ 147, 148, 149. These allegations are surrogates for the theory that Plaintiffs' Shell dealerships (the right to obtain Shell gasoline and use Shell's trademark) established by the Dealer Agreement are the relevant tying products for Plaintiffs as the consumers in issue. *See* Plaintiffs' First Amended Complaint, at 19, ¶ 138; at 21, ¶ 141; at 21–22, ¶¶ 148, 149, 152, 153.

Plaintiffs allege various theories as to the *tied products* under Defendants' ICR policy. In Counts I and II Plaintiffs allege that the tied product is the ICRs *per se,* since Plaintiffs are required to make monthly payments to Defendants for this equipment which Defendants allegedly require. *See* First Amended Complaint, at 17, ¶ 128; at 20, ¶ 138; at 21, ¶ 147. Plaintiffs also allege in Count I that the tied product is the bank credit card processing services which Defendants select and require in connection with all ICR transactions. *See id.* at 20, ¶¶ 139, 140.

*Sufficiency Under Tying Doctrines Generally.*—Plaintiffs' allegations are insufficient to state a tying claim in which the Shell trademark and right to receive gasoline are the tying products. Plaintiffs have not alleged that Defendants have

---

**10.** Plaintiffs' claim under this theory is exactly the same as the claim at issue in *Ajir v. Exxon Corp.,* 1995 WL 429234 (N.D.Cal. 1995). In *Ajir,* independent Exxon dealers brought suit against the manufacturer Exxon alleging that Exxon illegally tied the use of Exxon-owned tanks, lines, and equipment to the purchase of Exxon brand gasoline. *Id.* at *4. The district court in that case found that

the relevant market in that case was the market for gasoline franchises. *Id.* at *5; *see also Wilson v. Mobil Oil Corp.,* 940 F.Supp. 944, 950 (E.D.La.1996) (relevant market was fast lube franchises); *Collins v. Int'l Dairy Queen, Inc.,* 939 F.Supp. 875, 880 (M.D.Ga.1996) (relevant market was soft-serve ice cream franchises).

market power in the gasoline trademark/franchise market generally. Nor do Plaintiffs allege that other gasoline franchises or branded gasoline are now or ever were available to them from other gasoline suppliers (*e.g.,* Texaco, Mobil or Chevron) without similar constraints. Nor do Plaintiffs allege that selling a different brand of gasoline would cost them less in general, or cost them less specifically because they could use different ICRs, could obtain different credit processing services, or could avoid ICRs at all.

■ *Effect of Contractual Relationships on Antitrust Analysis.*—Plaintiffs complain as to the ICR policy that Defendants' "tying arrangement is forcing Plaintiffs out of business" because Plaintiffs are "locked in" to the ICR policy in order to continue their supply of Shell gasoline. *See id.* at 19–21, ¶¶ 138–153. Plaintiffs and Defendants entered into Dealer Agreements which establish contractual relationships akin to a franchisee/franchisor relationship. As a result of this contract, Plaintiffs are obligated to purchase only Shell gasoline.

The "lock in" theory, insofar as Plaintiffs allege harm to themselves, rests entirely on the Supreme Court's opinion in *Kodak.*[11] Plaintiffs contend that the Supreme Court in *Kodak* held that antitrust liability may exist when the purchasers of a unique product demonstrate that they are "locked in" to buying tied products. In *Kodak,* the seller, Eastman Kodak Co., sold both complex copiers (and other expensive equipment), as well as aftermarket parts and repair services. *Id.* at 457, 112 S.Ct. 2072. All the equipment and parts were unique to *Kodak* and could not be "interchanged with other manufacturers' goods." *Id.* at 456–57, 112 S.Ct. 2072. In the early 1980s, independent entities ("independent service organizations" ("ISOs")) began to provide aftermarket repair services for Kodak equipment. The ISOs purchased parts both from Kodak and independent original equipment manufacturers ("OEMs"). In 1985 and 1986, Kodak instituted several policies in an attempt to destroy the ISOs. *Id.* at 458, 112 S.Ct. 2072. First, Kodak agreed to sell its replacement parts only to those owners of its equipment who used Kodak repair services. *Id.* Second, Kodak entered into agreements with the OEMs to limit sales of aftermarket parts to the ISOs. *Id.* As a result, the cost of aftermarket servicing and repairs rose considerably. *Id.*

The Supreme Court held that the plaintiff ISOs stated a viable Sherman Act § 1 claim in their allegations that Kodak's tie of aftermarket servicing and repairs to the purchase of Kodak equipment was illegal. *Id.* at 477, 112 S.Ct. 2072.[12] The Supreme Court held that the ISOs § 1 claim could go to a jury even though defendant Kodak did not have market power over the tying product, complex copiers. The Court reasoned that the purchaser of a new Kodak copier in effect was "locked in" to the purchase of Kodak's unique replacement parts market, over which Kodak had a

---

**11.** Plaintiffs do not make a serious attempt to make typical tying claim allegations, which include contentions about "cross-elasticity of demand between a given product and its substitutes." *United Farmers,* 89 F.3d at 235, n. 3 (citing PHILLIP E. AREEDA & DONALD F. TURNER; ANTITRUST LAW ¶ 519a (1991)).

**12.** The *Kodak* opinion had two discrete segments that addressed different theories of liability by the plaintiffs as to whether Kodak possessed sufficient market power in the tying market to sustain a Sherman Act § 1 claim. These segments form alternative bases for the Court's ultimate holding that summary judgment should not have been granted in favor of

defendant *Kodak.* Under the first theory, the tying products were the unique replacement parts for the previously purchased Kodak copiers and the tied product was repair services for the Kodak copiers. *Id.* at 462–63, 464–65, 112 S.Ct. 2072. In the second theory, the Supreme Court addressed Kodak's argument that the *Kodak* copiers, expensive items that were not easily replaceable, were the tying products and the tied product again was the repair service. The Court rejected Kodak's contention that the § 1 claim should fail because the company lacked appreciable market power in the copier equipment market. *Id.* at 465–79, 112 S.Ct. 2072.

100% monopoly. Through its total control of the replacement parts, Kodak had the power to manipulate the market for repair services of its copiers. *Id.* at 465, 112 S.Ct. 2072. The Supreme Court thus held that plaintiffs had met their summary judgment burden to raise a fact question. The Court then addressed an alternative argument by Kodak, that it lacked market power in the copier market (an alternative tying product). The Court held that the lack of power in the tying product market was not dispositive of the tying claim because its prices for after-market goods were limited by the competitive market for the original equipment; Kodak contended that the increase in profits it could earn from higher prices in the after-markets for parts and service "would be offset by a corresponding lost in profits from lower equipment sales as consumers began purchasing equipment with more attractive service costs." *Id.* at 465–66, 112 S.Ct. 2072. The Supreme Court rejected this argument because, at the time of the consumer's original equipment purchase, the consumer did not have the information necessary to determine the ultimate cost of the tying good, the purchase price of the complicated copiers plus all maintenance costs (service and repairs) over the life of that equipment. *Id.* at 476, 112 S.Ct. 2072. In addition, the Court noted that evidence established that the cost of the ultimate consumer switching the tying product (the copiers) after the initial purchase was prohibitively high. *Id.* at 477, 112 S.Ct. 2072. Thus, the Court held that it was possible that Kodak's attempt to increase overall profits by tying its monopolistic control of aftermarket parts and services to sales of its equipment could constitute an illegal tie, and that the district court's grant of summary judgment in favor of Kodak was improper. *Id.* at 477–79, 112 S.Ct. 2072.

This Court concludes that the *Kodak* "lock in" theory does not govern Plaintiffs' tying claims in the case at bar. There are material distinctions between the circumstances of a Kodak copier purchaser and Plaintiff lessee-dealers in the instant case. In *Kodak,* there was no long term contrac-

tual relationship between the copier purchaser and Kodak. Rather, provision of repair services or parts was an independent transaction between the copier owner (the consumer) and the supplier of the repair services; customers of Kodak equipment did not enter into any contractual obligation to purchase aftermarket service and parts from Kodak. *See Kodak,* 504 U.S. at 457–58, 112 S.Ct. 2072. Indeed, the absence of a required service agreement with Kodak had provided the opportunity to the ISOs to thrive for years. Moreover, integral to the Court's analysis was Kodak's indisputable monopoly on the replacement parts market, one of the tying products, although the replacement parts were not included in the original copier purchase.

In contrast, Plaintiffs at bar have pre-existing and continuing contractual relationships with Defendants. Specifically, each Plaintiff signed a detailed Dealer Agreement and is obligated to comply with requirements in related documents such as the "Image Excellence Book" that establish a marketing plan prescribed by Defendants. *See* Plaintiffs' First Amended Complaint, at 11–12, ¶¶ 90–93. Plaintiffs are "locked in" to Defendants' ICR policy because of their supply contracts and contractual marketing requirements. It is these agreements that dictate how Plaintiffs are to sell Shell gasoline and grant Defendants the power to dictate policy to Plaintiffs. *See Hyde,* 104 S.Ct. at 1565 ("[T]here is nothing inherently anti-competitive about packaged sales. Only if [buyers] are forced to purchase [the tied] services as a result of the [*seller's*] *market power* would the arrangement have anti-competitive consequences.") (emphasis added); *see also Queen City Pizza,* 124 F.3d at 441 (finding *Kodak* inapplicable where the plaintiffs were forced to purchase related products because of contractual requirements); *see generally United Farmers,* 89 F.3d 233 (5th Cir.1996). Plaintiffs' complaints about the ICR Policy challenge the way Defendants require their dealers (*i.e.,* franchises) to market

and sell the supplier's franchised product. These allegations presume Plaintiffs have an entitlement to Shell gasoline outside the relationship created by the Dealer Agreement.

Plaintiffs arguments attack the essence of the parties' contractual relationship. Plaintiffs artificially attempt to separate the means of delivery of the Shell gasoline to retail customers from the franchise relationship. Receipt and processing of retail customers' payments for retail gasoline purchases is an integral part of a gasoline dealer's function. Plaintiffs' challenge to Defendants' ICR policy amounts to an attack on the scope of parties' franchise relationship, and thus sounds in contract, or conceivably tort, not antitrust. The relationship between Plaintiffs and Defendants here is materially different from the circumstances in *Kodak* and its progeny.[13] *Kodak* does not resuscitate life into Plaintiffs' otherwise insufficient tying allegations.

This conclusion is consistent with two circuit court rulings. First, in *United Farmers*, the Fifth Circuit indicated skepticism of antitrust claims arising solely from contractual relationships. In that case, the United Farmers Agents Associa-tion, Inc. ("UFAA") and insurance agents selling Farmers insurance sued Farmers, alleging that Farmers illegally tied the sale of specifically configured computers to its sale of electronic policyholder information. *See United Farmers*, 89 F.3d at 235. The Fifth Circuit held, in affirming a district court's grant of summary judgment in favor of Farmers, that the relevant market was insurance sales and that the UFAA did not present evidence that Farmers had market power in the insurance sales market. *Id.* at 237.[14]

The court of appeals in *United Farmers* further concluded that, even if it assumed the narrower tying product market advocated by the plaintiffs, UFAA had failed to offer any evidence concerning the supra-competitive price of the tied product, the specially configured computers. *Id.* The Fifth Circuit stated that:

> This suit is essentially an intracompany dispute over how to run a computer system, not a valid claim under antitrust laws. *Economic power derived from contractual arrangements such as franchises or in this case, the agents' contract with Farmers, has nothing to do*

---

**13.** Plaintiffs' theory that Shell gasoline is tied to the ICR policy arguably could be analogized to the *Kodak* parts/services tie; however, Plaintiffs' tying claim would not survive under this portion of the *Kodak* reasoning. In *Kodak*, the aftermarket parts (the tying product) were indisputably unique and Kodak had a monopoly in that market. Plaintiffs' contention that Shell gasoline *per se* (or even the Shell trademark) is a unique product lacks merit under antitrust doctrines. Neither Shell gasoline nor the Shell trademark are legally recognized unique products for antitrust purposes. *See* discussion *infra,* at 30–31. Plaintiff lessee-dealers are restricted to Shell gasoline and the Shell trademark because of their contractual relationships with Defendants, not because the product or trademark is unique under the law.

**14.** Nothing in the *United Farmers* holding indicates that the Fifth Circuit would disagree that the relevant market in the case at bar is retail gasoline franchises generally or all branded gasoline, and not the markets as defined by Plaintiffs, the Shell trademark or Shell gasoline *per se*. In *United Farmers*, the Fifth Circuit pointed out that the plaintiffs had failed to allege that the Farmers' insurance products were unique or that consumers would pay more for that coverage. *See* 89 F.3d at 236. Since the plaintiffs had made no such allegations, there was no need for the court of appeals to analyze the next issue, namely, whether those allegations were legally sufficient to define a relevant market. There is no indication that the court of appeals intended to engage in this analysis. *See and compare Town Sound and Custom Tops, Inc. v. Chrysler Motors Corp.,* 959 F.2d 468, 479–80 (3d Cir.1992). Therefore, this Court concludes that the passing comment concerning lack of evidence of uniqueness of Farmers' insurance products is not meaningful precedent or support for Plaintiffs' claims that the Shell brand gasoline or trademark is a relevant tying product or that Plaintiffs' bald allegations of uniqueness are legally sufficient.

*with market power, ultimate consumers' welfare, or antitrust.*

*Id.* at 236–37 (emphasis added) (citation omitted).[15]

The limitation that franchise agreements impose upon antitrust claims is also addressed by the Third Circuit in *Queen City Pizza.* In *Queen City Pizza,* the plaintiffs were eleven Domino's Pizza, Inc. franchisees and the International Franchise Advisory Council, Inc. (a corporation formed to protect Domino's franchisees' common interests). As franchisees of Domino's, plaintiffs were required to sign a franchise agreement which provided that Domino's "may in [Domino's] sole discretion require that ingredients, supplies, and materials . . . be purchased directly from us or from approved suppliers or distributors." *Id.* at 433. The plaintiffs contended that years after the inception of plaintiffs' franchise agreements, Domino's initiated policies designed to limit the plaintiffs' ability to purchase less expensive ingredients and supplies from independent sources. *Id.* at 434. In response to Domino's actions, plaintiffs asserted various antitrust causes of action, including a tying claim alleging that Domino's illegally required franchisees to buy supplies and ingredients as a condition of obtaining fresh dough from Domino's. *Id.* at 436.[16]

The Third Circuit upheld the district court's Rule 12(b)(6) dismissal of plaintiffs antitrust claims. The court of appeals rejected the argument advanced by the plaintiffs that the relevant market was Domino's approved ingredients. *Id.* at 438. In so doing, the Third Circuit stated that "no court has defined a relevant product market with reference to the particular contractual restraints of the plaintiff." *Id.* (citing *Mozart Co. v. Mercedes–Benz of North America,* 833 F.2d 1342 (9th Cir. 1987)). The court of appeals explicitly found *Kodak* inapplicable and reiterated that the plaintiffs were involved in contractual franchise relationships with defendant: "[F]ranchising is a bedrock of the American economy . . . we do not believe the antitrust laws were designed to erect a serious barrier to this form of business organization." *Queen City Pizza,* 124 F.3d at 441. The appeals court concluded its distinction of *Kodak* by stating:

> [U]nlike the plaintiffs in *Kodak,* plaintiffs here must purchase products from Domino's Pizza not because of Domino's market power over a unique product, but because they are bound by contract

**15.** The alternative holding in *United Farmers* also is consistent with the result reached here. The court of appeals, after rejecting the plaintiffs' proposed relevant market (electronic access to Farmers' policy information), assumed the validity of that proposed relevant market and held that *Kodak* did not apply. *See* 89 F.3d at 237. The court of appeals then decided, using for the sake of discussion the relevant product market of "electronic access," that there was insufficient evidence of Farmers' market power in the tying market because the insurance market was so competitive. Engaging in a fact specific inquiry, the court held that the plaintiffs had failed to produce evidence of meaningful price discrimination or other evidence of market power. *See id.* at 237.

The allegations in Plaintiffs' First Amended Complaint in the instant case command similar conclusions. Plaintiffs' proposed tying product relevant markets, *i.e.,* Shell gasoline or trademark, are insufficient since a single brand of gasoline or a gasoline dealership franchise cannot constitute a relevant tying product. *See infra* at 641–42. Second, like in *United Farmers, Kodak* does not apply to the facts at bar. Third, the logical inference from Plaintiffs' own allegations is—contrary to Plaintiffs' intentions—that there is a very competitive market for branded gasoline, the primary alleged tying product. Finally, Plaintiffs have made no allegations as to the existence of other gasoline brand dealerships (the true competitors of Plaintiffs) being provided with more favorable terms vis à vis ICRs and related credit processing.

**16.** The franchise contract did not specifically mandate that the plaintiffs purchase the "dough" from Domino's. Rather, defendant Domino's required the plaintiff franchisees to purchase various other ingredients. The plaintiffs contended that Domino's allegedly increased prices of items it controlled and thus rendered unprofitable plaintiffs' efforts to save costs by making their own dough.

... [p]laintiffs' remedy, if any, is in contract, not under the antitrust laws.

*Id.* at 441.

The Third Circuit's rationale concerning contractual power and antitrust claims in *Queen City Pizza* is probative in the case at bar. Plaintiffs, by entering into their Dealer Agreements, were aware that Defendants would control the gasoline product and many aspects of the method of sales by Plaintiffs. Plaintiffs attempt to distinguish *Kodak* from *Queen City Pizza* on the grounds that the Domino's franchisee plaintiffs, unlike those in *Kodak* and the present case, were aware of the contractual provisions that necessitated purchase of the tied product when they entered the franchise contract. *See* Plaintiffs' Response, at 11 & n. 5. The Court is unpersuaded. The Third Circuit squarely held that franchise agreements do not give rise to antitrust liability. Any discussion of the knowledge of the franchisees in *Queen City Pizza* is ancillary to this main point. Moreover, the ties in issue in *Queen City Pizza* were imposed after the parties had entered into the initial franchise agreements. *See Queen City Pizza,* 124 F.3d at 434.[17]

As stated in *United Farmers,* "[e]conomic power derived from contractual arrangements such as franchisees ... has nothing to do with market power, ultimate consumers' welfare, or antitrust." *See United Farmers,* 89 F.3d at 236–237. The only reason that Shell gasoline is "unique" for the Plaintiffs (lessee-dealers) is that they have contracted to sell Shell gasoline. Plaintiffs' tying claim complaining of injury to Plaintiffs as lessee-dealers therefore does not fit within the wrongs antitrust laws were designed to address.[18]

In summary, the Court holds that, in the case at bar, Plaintiffs' allegations are insufficient to escape the constraints of the Dealer Agreements, Plaintiffs' voluntary contractual arrangements with Defendants.

***Lack of Allegations of Lessening of Competition in Tied Product's Market.—*** *Kodak* also fails to assist Plaintiffs because Plaintiffs' First Amended Complaint does not allege that Defendants' tying arrangement had an anti-competitive effect on the ICR market or the market for bank processing services of ICR transactions. Thus, Plaintiffs fail as a matter of law to allege an illegal tying claim. *Kodak* eliminates the need to plead market power in the tying product, but does not excuse failure of a plaintiff to allege an effect on competition in the tied product's market.

Examples of Plaintiffs' allegations are that "[a]s a result of Shell's mandates regarding ICR financing, Plaintiffs have been forced to pay a higher lease amount for the ICR machines than they would have incurred had they been able to purchase them outright or lease them from another party." Plaintiffs' First Amended Complaint, at 22, ¶ 151. *See also id.* at 18, ¶¶ 130, 131. Plaintiffs in their Response state that "[i]n the absence of a tie, plaintiffs would have selected different banks with more favorable rates." Plaintiffs' Response, at 12. These allegations are legally insufficient.

Indeed, Plaintiffs' allegations have the unintended consequence of demonstrating

---

**17.** There is one district court case in this circuit that has declined to apply the rationale of *Queen City Pizza. See Wilson v. Mobil Oil Corp.,* 940 F.Supp. 944, 950 (E.D.La.1996). Responding to the defendant's claims that *Kodak* was inapplicable in the franchise context, the district court rejected the *Queen City Pizza* district court's holding, 922 F.Supp. 1055 (E.D.Pa.1996), held that *Kodak* was applicable in a franchise situation, and that there was no "principled distinction ... between the franchise context and the durable equipment market involved in *Kodak." Wilson,* 940 F.Supp. at 950. This Court respectfully disagrees with the conclusions in *Wilson.*

**18.** There is a dearth of appellate analysis on the limits of *Kodak* or the effect of franchise agreements to antitrust claims. Plaintiffs have not proffered legal authorities that support their theories in light of longstanding antitrust principles. *See Hyde,* 466 U.S at 15–16, 104 S.Ct. 1551; *Town Sound,* 959 F.2d at 475; *Breaux Brothers,* 21 F.3d at 86.

that the markets for ICRs and credit card processing services have not been affected by Defendants' ICR policy. Plaintiffs believe they could find comparable ICR products and services at a lower price from third party sources. Plaintiffs thus indicate that the market for those products and services experiences competition. Therefore, the Court concludes that Plaintiffs have failed to allege an anti-competitive effect on the markets for the tied products.

### 5. Retail Consumers of Shell Gasoline

*Insufficient Allegations Concerning Tying Product Market.*—Plaintiffs allege a second illegal tying theory: they allege that Defendants' policies harm retail gasoline purchasers, the ultimate gasoline consumer. In this context, Plaintiffs contend that the tying product is Shell gasoline.

■ "[M]arket power is a necessary prerequisite to an illegal tie." *See United Farmers,* 89 F.3d at 235. In order to show market power, a plaintiff first must define the relevant market. While the exact contours of the relevant market depend upon factual determinations, the antitrust plaintiff in a tying claim at a minimum must *allege* a relevant market. *See Queen City Pizza,* 124 F.3d at 436 (there is no *"per se* prohibition against dismissal of antitrust claims for failure to plead a relevant market under Fed.R.Civ.P. 12(b)(6)."). A key in determining the relevant market includes an analysis of the cross-elasticity of demand for the product in question and all of its potential substitutes. In other words, "[t]he outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Id.* (quoting *Brown Shoe Co.,* 370 U.S. at 325, 82 S.Ct. 1502).

Plaintiffs' allegations as to the retail gasoline consumer fail as a matter of law for two reasons. First, the only tying product as to which Plaintiffs plead a relevant market in which Shell has market power is Shell gasoline, which Plaintiffs allege is "unique" because of "special patented additives in which Shell has market power." Plaintiffs' First Amended Complaint, at 19, ¶ 139; at 21, ¶ 147. Plaintiffs claim that Defendants' actions "harm[ ] the ultimate consumer who must endure higher prices to get the unique Shell gasoline product." Plaintiffs' First Amended Complaint, at 20, ¶ 142; at 21, ¶ 150. In addition, Plaintiffs allege that the tying product is "Shell's trademark." *Id.* at 19, ¶¶ 138, 139.

Plaintiffs' definition of the tying product market makes no reference to cross-elasticity of demand. Plaintiffs' allegations amount only to the contention that consumers may prefer Shell brand gasoline. Plaintiffs do not allege that there are no close substitutes for Shell gasoline. A single product, rarely constitutes a market for antitrust purposes, even if that product is a trademarked product. *See Town Sound and Custom Tops, Inc.,* 959 F.2d at 479. In *Town Sound* the Third Circuit held that "a prestigious trademark is not itself persuasive evidence of economic power because a trademark, unlike a patent, protects only the name or symbol and not the product itself." *Id.* In response to an attempt to define the relevant market in terms of a single trademarked product, the Seventh Circuit stated that:

> Not even the most zealous antitrust hawk has ever argued that Amoco gasoline, Mobil gasoline, and Shell gasoline are three separate product markets, yet that absurd result would follow if we recognized Olympian trademarked generator sets as a separate market in this case.

*Generac Corp. v. Caterpillar Inc.,* 172 F.3d 971, 977 (7th Cir.1999).

Therefore, the Court concludes with respect to the retail consumer theory that Plaintiff has failed to plead a legally viable relevant market or to plead that Defendants possessed market power over a viable relevant product market.

*No Effect on Tied Market.*—Plaintiffs' tying claim of alleged harm to retail con-

sumers also is insufficient because Plaintiffs fail to allege that Defendants' ICR policy creates an adverse effect on a retail consumer market for any tied product. Plaintiffs, as noted above, do not make allegations concerning impact on the markets for ICRs and credit processing services.

▇▇▇▇ Even if Plaintiffs alleged a legally cognizable market from the retail gasoline consumers' perspective, their theory fails since Plaintiffs do not allege that there is a tied product or any tying agreement as to these consumers. The Supreme Court has stated that a tying arrangement must link "two distinct markets for products that [are] distinguishable in the eyes of buyers." *Hyde*, 466 U.S. at 20, 104 S.Ct. 1551. There can be no tying arrangement unless there is a "distinct demand" for the tied product. *See Collins v. Associated Pathologists, Ltd.*, 844 F.2d 473, 477 (7th Cir.1988). One indicator of this distinct demand for the tied product is whether consumers make specific requests for it. *Id.* Plaintiffs have not alleged—and cannot allege—that there is a distinct demand among retail gasoline buyers for a particular brand of ICR or for a certain bank's processing services separate from the gasoline purchase. Potential choices in ICRs or credit processing services are apparent only to the dealers.

Indeed, Plaintiffs' own allegations imply that for the gasoline consumer, there is only one product, Shell gasoline. Plaintiffs allege that the price of that *gasoline* is the dispositive factor for the retail consumer. Plaintiffs' First Amended Complaint, at 20, ¶ 142; at 20–21, ¶ 145; at 22, ¶ 153. From the *consumer's* perspective, the tying product, gasoline, and the tied products, ICRs and related credit processing services, are offered in the same transaction.

Plaintiffs have not alleged that gasoline consumers make (or seek to make) a separate choice as to which ICR or related credit service to use. *See Roy B. Taylor Sales*, 28 F.3d at 1384 ("a foreclosure of choice to an ultimate consumer appears to be the principal key to a tie that is illegal per se").[19]

The Court thus concludes that Plaintiffs have failed to allege a *per se* unlawful tying arrangement for either Plaintiffs as the consumers, or for Plaintiffs' retail consumers. Therefore, Defendants' Motion to Dismiss Plaintiffs' *per se* illegal tying claims under § 1 of the Sherman Act in Count I of Plaintiffs' First Amended Complaint should be granted.

### 6. Rule of Reason Analysis on Tying Claims

▇▇▇▇ Claims that do not state a *per se* violation are analyzed under the rule of reason. *See United Farmers*, 89 F.3d at 236 n. 2 (citing *Hyde*, 466 U.S. at 29, 104 S.Ct. 1551). Using a rule of reason analysis, this Court reaches the same conclusion as set forth above on the *per se* analysis; Plaintiffs have failed to state a viable tying claim.

In a case involving the rule of reason, the plaintiff must demonstrate that the defendants' behavior "unreasonably restrained competition" (*See Hyde*, 466 U.S. at 29, 104 S.Ct. 1551), or "suppresses competition" (*Nat'l Society of Prof'l Engineers v. United States*, 435 U.S. 679, 691, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978)). In a tying case, the rule of reason test requires an additional "inquiry into the actual effect of the [tying arrangement] on competition in the market for the tied good." *Breaux Brothers Farms Inc. v. Teche Sugar Co.*, 21 F.3d 83, 88 (5th Cir.1994) (citing *Hyde*,

**19.** Plaintiffs may attempt to bolster their contention that there is an unlawful tie because the two products (gasoline and ICR services) are offered together and therefore the consumer is induced to use them together for convenience. This argument however is futile. Offering convenience to the consumer does not demonstrate an unreasonable restraint on competition. *See Roy B. Taylor Sales*, 28 F.3d at 1385 (citing *Hyde*, 466 U.S. at 29–30, 104 S.Ct. 1551) ("[T]he fact that consumers might buy goods because of a convenience created by a tie does not suffice as evidence of an unreasonable restraint on competition.").

466 U.S. at 29, 104 S.Ct. 1551). As explained in the foregoing analysis, Plaintiffs have not alleged any effect on the market for ICRs and credit processing services. Therefore, the Court concludes that under a rule of reason analysis, Plaintiffs have failed to state an illegal tying claim under the Sherman Act § 1.

### 7. Clayton Act § 3 Analysis

Defendants' Motion seeks dismissal of Plaintiffs' Clayton Act § 3 tying claim alleged in Count II of their First Amended Complaint. Plaintiffs allege in Count II that § 3 is violated by the ICR policy generally, but they focus more specifically on the requirement that Plaintiffs lease ICRs of Defendants' choice. See Plaintiffs' First Amended Complaint, at 21–22, ¶¶ 147, 148, 151.[20] Plaintiffs allege that although Defendants may not produce the ICRs in question, they lease the ICRs "to Plaintiffs at inflated monthly fees." Plaintiffs Response at 14. Plaintiffs have not responded to the Motion with any briefing pertaining to § 3.

▬ The Clayton Act § 3 provides in pertinent part:

It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of *goods, wares, merchandise, machinery, supplies, or other commodities* ... on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

15 U.S.C. § 14 (emphasis added). Clayton Act § 3 applies only when both the tying

and tied products are goods. See Marts v. Xerox, 77 F.3d 1109, 1113 n. 6 (8th Cir. 1996); Crossland v. Canteen Corp., 711 F.2d 714, 719 n. 1 (5th Cir.1983). Tying arrangements that involve services are not governed by § 3. See Advance Business Sys. and Supply Co. v. SCM Corp., 415 F.2d 55, 61 (4th Cir.1969).

▬ Plaintiffs attempt to fit within the Clayton Act § 3 rubric by contending that the tied "goods" are Defendants' selection of ICRs. As a practical matter, however, the required lease of Defendants' choice of ICRs is part and parcel of the "pay at the pump" service that is mandated by Defendants for the retail customers at Shell gasoline stations. ICRs are merely the means to implement the credit purchases in issue. Indeed, Plaintiffs in Count II reallege all prior allegations in the First Amended Complaint, and then state first and foremost that "Shell's practice of coercing Plaintiffs to agree to lease ICRs and forcing Plaintiffs to agree to utilize only Shell's chosen bank to process credit card transactions constitutes an illegal tying arrangement as is prohibited by § 3 of the Clayton Act." Id. at 21, ¶ 147. When read in context, Plaintiffs' tying claim in Count II thus involves the coerced use of services, not merely the purchase or lease of goods. Plaintiffs' Count II tying claim is therefore outside the scope of the Clayton Act § 3.

In any event, analysis of the sufficiency of the pleadings under the Clayton Act § 3 is virtually the same as under § 1 of the Sherman Act. See Southern Card & Novelty, Inc. v. Lawson Mardon Label, Inc., 138 F.3d 869 (11th Cir.1998) ("As our predecessor court made clear, the two statutory theories of liability are substantively synonymous." (citing Bob Maxfield, Inc. v. American Motors Corp., 637 F.2d 1033, 1037 (5th Cir. Unit A 1981))). Thus, to the extent the tied product in Plaintiffs' Count

---

**20.** Except for isolated words, such as Plaintiffs' defining the tied product as ICRs, id. at 21, ¶ 147, Plaintiffs' Clayton Act § 3 claim parrots Count I, their Sherman Act § 1,

claim, which defines the tied product in part as the Defendants' mandated credit processing services.

II tying claim involves "goods" and therefore properly is governed by the Clayton Act § 3, the Court nevertheless concludes that Plaintiffs have failed to state a legally cognizable claim for the same reasons set forth above in regard to the Sherman Act § 1 tying claim.

Since Plaintiffs have failed to allege a viable illegal tying claim under either possible theory, Counts I and II of Plaintiff's First Amended Complaint must be dismissed.

## B. *Robinson–Patman Act Illegal Price Discrimination*

 Plaintiffs also allege that Defendants have engaged in illegal price discrimination under § 2(a) of the Clayton Act as amended by the Robinson–Patman Price Discrimination Act, 15 U.S.C. § 13(a) (collectively, the "Robinson–Patman Act").[21] To establish a violation of the Robinson–Patman Act, each Plaintiff must prove the following four elements:

(1) that one or more of Defendants' sales of gasoline in issue as to that Plaintiff was made in interstate commerce;

(2) that the gasoline supplied by Defendants directly or through jobbers to stations competing with the particular Plaintiff was of the same grade and quality as the gasoline sold to that Plaintiff;

(3) that Defendants discriminated in price as between the identified jobber (or other competing buyer) and the Plaintiff in issue, and

(4) that the discrimination had a prohibited effect on competition.

*See Texaco Inc. v. Hasbrouck*, 496 U.S. 543, 555, 110 S.Ct. 2535, 110 L.Ed.2d 492 (1990); 15 U.S.C. § 13(a). In addition, to recover damages, a Plaintiff must prove the extent of his actual injuries. *Id.*[22]

Defendants basically contend that Plaintiffs' Robinson–Patman Act claims fail because Plaintiffs' purchases of Shell gasoline do not take place "in commerce." Shell gasoline sold to each Plaintiff, Defendants argue, is produced in the same state in which that Plaintiff is located. The Court will address Plaintiffs' various responsive arguments in turn.

### 1. Interstate Commerce Requirement

 *Legal Standards Governing Interstate Commerce Element.*—Analysis of these arguments in context is necessary. The Robinson–Patman Act has a stringent interstate commerce requirement. *See McCallum v. City of Athens, Ga.*, 976 F.2d 649, 657–58 (11th Cir.1992) (adopting the Fifth Circuit standards); *Littlejohn v. Shell Oil Co.*, 483 F.2d 1140, 1144 (5th Cir.1973) (*en banc*) ("The language of the act—requiring discriminatory sales be 'in commerce'—is far narrower in scope than

---

**21.** These claims allege violations of § 2(a) of the Clayton Act, as amended by the Robinson–Patman Act, which provides:

It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States ... where the effect of such competition may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injury, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them.

15 U.S.C. § 13(a).

**22.** Plaintiffs argue that this is a "secondary-line" Robinson–Patman Act claim. "In order to establish secondary-line price discrimination under section 2(a), a plaintiff has the burden of establishing four facts: (1) that seller's sales were made in interstate commerce; (2) that the seller discriminated in price as between the two purchasers; (3) that the product or commodity sold to the competing purchasers was of the same grade and quality; and (4) that the price discrimination had a prohibited effect on competition." *George Haug Co.*, 148 F.3d at 141 (citing *Texaco, Inc. v. Hasbrouck*, 496 U.S. 543, 556, 110 S.Ct. 2535, 110 L.Ed.2d 492 (1990)).

the 'effect on commerce' test applicable under the Sherman Antitrust Act."); *Cliff Food Stores, Inc. v. Kroger, Inc.,* 417 F.2d 203, 208 (5th Cir.1969) (same); *Foremost Dairies, Inc. v. FTC,* 348 F.2d 674 (5th Cir.1965). Sales that merely "affect" interstate commerce do not meet the Robinson–Patman Act "in commerce" standard. *See Gulf Oil Corp. v. Copp Paving Co.,* 419 U.S. 186, 195, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974) ("[T]he jurisdictional requirements of [the Robinson–Patman Act] cannot be satisfied merely by showing that allegedly anti-competitive acquisitions and activities affect commerce.").

In contrast with the Sherman Act, in which Congress exercised "the utmost extent of its Constitutional power in restraining trust and monopoly agreements," *United States v. South–Eastern Underwriters Ass'n,* 322 U.S. 533, 558, 64 S.Ct. 1162, 1176, 88 L.Ed. 1440 (1944), "the distinct 'in commerce' language of the Clayton and Robinson–Patman Act[s] ... denote[ ] only persons or activities within the flow of interstate commerce—the practical, economic continuity in the generation of goods and services for interstate markets and their transport and distribution to the consumer," *Gulf Oil Corp. v. Copp Paving Co.,* 419 U.S. 186, 195, 95 S.Ct. 392, 398, 42 L.Ed.2d 378 (1974). Claims under the Robinson–Patman Act must be predicated on the occurrence of an interstate sale of the relevant commodity. *See S & M Materials Co. v. Southern Stone Co.,* 612 F.2d 198, 200 (5th Cir.1980) ("the cases establish that the state of being 'in commerce' under § 2(a) [of the Clayton Act] requires physical movement of the *relevant product* across a state line") (emphasis added).

*McCallum,* 976 F.2d at 655–56 (footnote omitted); *accord, Godfrey v. Pulitzer Publishing Co.,* 161 F.3d 1137, 1141 (8th Cir. 1998); *Littlejohn,* 483 F.2d at 1142, 1143–44; *Bacon v. Texaco, Inc.,* 503 F.2d 946 (5th Cir.1974), *cert. denied,* 420 U.S. 1005,

95 S.Ct. 1447, 43 L.Ed.2d 763 (1975); *Scranton Construction Co. v. Litton Indus. Leasing Corp.,* 494 F.2d 778 (5th Cir.1974).

***Interstate Commerce Analysis.***—Defendants' argument is founded on the factual assertion that the gasoline each Plaintiff resells at its retail stations is manufactured in the same state in which that Plaintiff is located. The Court is restricted to a review of Plaintiffs' First Amended Complaint. *See Lovelace,* 78 F.3d at 1017–18. None of the seventy-three Plaintiffs in this case has pleaded with specificity a source of supply of gasoline. Nor has any Plaintiff identified the jobber or other Shell gasoline station with which that Plaintiff competes, which that Plaintiff contends receives discriminatory gasoline prices from Defendants. The Court previously has directed Plaintiffs to address these factual matters through Defendants' interrogatories authorized by the Court at its pretrial conferences.

Nevertheless, since the parties have fully briefed their legal positions on the Robinson–Patman Act's jurisdictional "in commerce" element and this issue is a threshold matter, the Court will analyze the legal standards in light of the pending allegations.

The foregoing standards dictate that Plaintiffs who live in the same state in which Defendants refine the gasoline supplied to both those Plaintiffs *and* to the jobbers or others whom Plaintiffs contend receive favored pricing do not have a viable Robinson–Patman Act claim because they cannot meet the jurisdictional interstate commerce element.[23] These Plaintiffs, in recognition of this problem, assert several theories in an attempt to salvage their Robinson–Patman Act claims. The Court will address these arguments in turn.

---

**23.** Defendants do not dispute that the Robinson–Patman Act's "in commerce" requirement is met for a Plaintiff that purchases

wholesale gasoline from a supplier located in a different state from that Plaintiff.

Plaintiffs first contest Defendants' jurisdictional argument by contending that all Plaintiffs, regardless of their wholesale suppliers' locations, satisfy the interstate commerce element because Plaintiffs sell Shell gasoline to retail customers whose vehicles thereafter travel across state lines.[24] This argument is rejected. Retail goods delivered from out of state to an in-state buyer who then re-sells the goods to retail customers generally "cease to be in the flow of interstate commerce" when the goods reach the in-state retailer. *Cliff Food Stores, Inc.*, 417 F.2d at 209.[25] Plaintiffs' argument concerning Plaintiffs gasoline sales to retail customers therefore cannot satisfy the "in commerce" requirement of the Robinson–Patman Act.

Plaintiffs' "retail sales" jurisdictional argument fails also because the retail sales by Plaintiffs to consumers are not the transactions that Plaintiffs claim are discriminatory. The Fifth Circuit has held that "[u]nder the terms of section 13(a) [of the Robinson–Patman Act] ... at least one of the sales alleged to be discriminatory must actually be in interstate commerce." *Cliff Food Stores, Inc. v. Kroger, Inc.*, 417 F.2d 203, 208 (5th Cir.1969). In *Cliff Food Stores*, the court of appeals reaffirmed its observation in *Hiram Walker, Inc. v. A & S Tropical, Inc.*, 407 F.2d 4 (5th Cir.1969), *cert. denied*, 396 U.S. 901, 90 S.Ct. 212, 24 L.Ed.2d 177 (1969),[26] that:

In order to come within the provisions of the Robinson–Patman Act, the (plaintiff) must demonstrate that the discriminatory sales were "in commerce." ... Thus, the Robinson–Patman Act is applicable only where the allegedly discriminatory transactions took place in interstate commerce. That is, "... at least one of the two transactions which, when compared, generate a discrimination must cross a state line."

*Cliff Food Stores, Inc.*, 417 F.2d at 208–09. Plaintiffs' Robinson–Patman Act claims center wholly on discriminatory *wholesale* sales by Defendants. In order to satisfy the jurisdictional requirement of the Robinson–Patman Act, Plaintiffs must allege an interstate wholesale sale of gasoline. Plaintiffs have not done so. Plaintiffs' attempt to satisfy the interstate commerce element of their Robinson–Patman Act claim by referring to Plaintiffs' own retail sales is futile.

Plaintiffs secondarily attempt to satisfy the "in commerce" requirement by arguing that the additives in Shell gasoline travel through interstate commerce prior to being blended into Defendants' gasoline.[27] This argument ignores the Fifth Circuit's longstanding rule that the mere interstate transportation of ingredients used to make a product that is sold intrastate does not satisfy the jurisdictional requirements of the Robinson–Patman Act. *See Bacon v.*

---

**24.** Plaintiffs allege that:

Shell's sale of gasoline to jobbers and lessee-dealers occur "in commerce," or in the "uninterrupted flow of commerce" as the product, gasoline, crosses state lines either *before arriving* at the *seller's* location, *or after leaving* the buyer.

Plaintiffs' First Amended Complaint, at 10, ¶ 86 (emphasis added).

**25.** The Fifth Circuit noted that there are limited exceptions to this rule. Retail goods remain part of the flow of commerce in only three situations:

(1) The goods are purchased upon the order of a customer with the definite intention that the goods are to go at once to the customer,

(2) The goods are purchased by the retailer to meet the needs of a specified customer pursuant to some understanding with the customer; and

(3) The goods are purchased by the retailer based on the anticipated needs of a specific customer.

*Cliff Food Stores, Inc.*, 417 F.2d at 210. None of these exceptions are alleged to apply in this case.

**26.** The *Hiram Walker* case was cited with approval by the Supreme Court in *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 200 & n. 17, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974).

**27.** Plaintiffs state that "[t]he additives are made and produced throughout the United States and added to the end product during refining...." Plaintiffs' First Amended Complaint, at 10, ¶ 86.

*Texaco, Inc.*, 503 F.2d 946, 948 (5th Cir. 1974) (in a case where the sales of gasoline were in issue, the interstate movement of crude oil prior to being refined into the gasoline was held insufficient) [28]; *Scranton Construction Co., Inc. v. Litton Industries Leasing Corp.*, 494 F.2d 778 (5th Cir.1974) (holding that the "interstate movement of mere ingredients" does not suffice to satisfy the "in commerce" requirement); *accord McCallum*, 976 F.2d at 657–58.

Plaintiffs' "ingredients" interstate commerce argument also fails because Plaintiffs focus on the wrong transactions. As discussed above, each Plaintiff, to state a legally viable claim, must allege that one of the discriminatory wholesale transactions involving refined Shell gasoline was in interstate commerce. *See, e.g., Cliff Food Stores, Inc.*, 417 F.2d at 208.

Last, Plaintiffs vaguely assert that Defendants' interstate promotions and advertising of Shell gasoline satisfies the "in commerce" requirement. *See* Plaintiffs' Response, at 16. This argument is rejected for several reasons. First, there is no such allegation in Plaintiffs' First Amended Complaint.[29] Even if Plaintiffs had included such an allegation in their First Amended Complaint, Plaintiffs cite no case law for the proposition that interstate advertising and promotion somehow convert an intrastate sale of gasoline to an interstate transaction.

Plaintiffs' reliance on *Shreveport Macaroni Mfg. Co., v. Fed'l Trade Comm'n*, 321 F.2d 404 (5th Cir.1963), is misplaced. In that case, the Fifth Circuit held that the acts of advertising or promotion were part of the discrimination in issue (which actually were advertising or promotion allowances to two customers) and the allowances themselves were "in commerce." The court of appeals noted that the allowance payments could be said to have been derivative of the interstate sales. *Id.* at 408–09 (citing and discussing ROWE, PRICE DISCRIMINATION UNDER THE ROBINSON-PATMAN ACT (1962), at 393). *See generally McCallum*, 976 F.2d at 655–56 (footnote omitted); *Littlejohn*, 483 F.2d at 1142, 1143–44; *Bacon*, 503 F.2d at 948. In contrast, Plaintiffs at bar complain of Defendants' wholesale distribution practices. Therefore, Defendants' advertising efforts vis à vis retail sales of Shell gasoline are irrelevant to Plaintiffs' Robinson–Patman Act claim.

***Interstate Commerce Conclusion.***— Since the legal standards are clear, the Court directs the parties to apply this ruling in good faith to each Plaintiff's claims as soon as the necessary factual information is available to the parties through the early discovery authorized by the Court. Plaintiffs presumably will agree to dismissal of individuals who do not meet the jurisdictional requirement. Disputes as to any particular Plaintiff's standing in connection with these jurisdictional principles will be resolved by the Court through a summary judgment motion by Defendants or at trial.

**28.** The Fifth Circuit held:
The extensive process involved in refining crude oil into gasoline results in the alteration of the nature of the product. No 'flow of commerce' ever took place as to the gasoline which is the subject of this claimed wrong. Therefore, the prior travels of the atoms and molecules of crude oil from which it came are not determinative of the interversus intra-state nature of the end product refined therefrom.
*Bacon*, 503 F.2d at 948.

**29.** Plaintiffs refer to Defendants' advertising only in passing in their "Background Facts" allegations:
Consumers are generally willing to pay more for Shell brand gasoline because of

Shell's image as conveyed through Shell's advertising campaigns and by the overall appearance of Shell-branded stations as well as Shell's purported superior gasoline product which includes Shell's additive package thereby creating a Shell gasoline market.
First Amended Complaint, at 11, ¶ 88. Plaintiffs merely assert baldly in their Response that "interstate promotions and advertising demonstrate that Shell views the relevant markets as interstate in nature." Plaintiffs' Response, at 16. This allegation is not fleshed out and the Court can only surmise its meaning.

### 2. Lessening of Competition Element of Plaintiffs' Robinson–Patman Claim

Defendants argue that Plaintiffs have not, and cannot, allege a substantial lessening of competition in the gasoline market and, therefore, Plaintiffs' Robinson–Patman Act claim must fail. Defendants' Motion, at 18 (citing *M.C. Manufacturing Co. v. Texas Foundries, Inc.,* 517 F.2d 1059, 1066 (5th Cir.1975), *cert. denied,* 424 U.S. 968, 96 S.Ct. 1466, 47 L.Ed.2d 736 (1976); *Oreman Sales, Inc. v. Matsushita Electric Corp.,* 768 F.Supp. 1174, 1184 (E.D.La.1991)). Defendants assert—without citation of any legal authority or explicit reasoning—that "Plaintiffs' First Amended Complaint ... is fatally defective because plaintiffs have not, indeed cannot, allege facts which would show that Shell's sale of gasoline to 'jobbers' at a lower price than to plaintiffs has or is likely to have a substantial anti-competitive impact on the sale of gasoline to the public.... [T]he most that plaintiffs' Section 2(a) claim alleges is that plaintiffs have been injured, not that there has been injury to competition." Defendants' Motion, at 18–19. Defendants further assert that Plaintiffs' allegations demonstrate that the sale of gasoline is a "fiercely competitive business." *Id.* at 19.[30] Defendants' argument appears to be that Plaintiffs (independent retail gas stations who receive deliveries of gasoline directly from Defendants) are in a functionally different position (*i.e.,* on a different level in the chain of distribution) from the jobbers (distributors/wholesalers) that Defendants supply with gasoline in bulk, and therefore any harm to Plaintiffs caused by Defendants' lower prices to the jobbers does not injure competition since Plaintiffs do not compete with the jobbers at the wholesale level of distribution.

Analysis of the adequacy of the lessening of competition issue necessitates an understanding of the elements of a Robinson–Patman Act claim and a review of recent Supreme Court and appellate authority that has altered the legal landscape for these claims.

▪ *Legal Standards Applicable to Robinson–Patman Act Claims.*—It has been said that the primary purpose of the Robinson–Patman Act is to protect the competitive process, not individual competitors. *E.g., Black Gold, Ltd. v. Rockwool Indus., Inc.,* 729 F.2d 676, 680 (10th Cir. 1984).

▪ There are three types of violations actionable under the Robinson–Patman Act. *See Texaco, Inc. v. Hasbrouck,* 496 U.S. 543, 558 n. 15, 110 S.Ct. 2535, 110 L.Ed.2d 492 (1990); *Godfrey v. Pulitzer Publishing Co.,* 161 F.3d 1137, 1139 (8th Cir.1998) (citing *Best Brands Beverage, Inc. v. Falstaff Brewing Corp.,* 842 F.2d 578, 584 n. 1 (2nd Cir.1987)); *George Haug Co.,* 148 F.3d at 141 n. 2 (citations omitted). First, in a "primary-line" case, the plaintiff must show that the defendant's price discrimination adversely affects the defendant's competition with its own competitors.[31] *Hasbrouck,* 496 U.S. at 558 n. 15, 110 S.Ct. 2535; *Godfrey,* 161 F.3d at 1139. In a "secondary-line" case, the plaintiff may demonstrate that the defendant's price discrimination injures competition among the defendant's customers, presumably, the plaintiff's competitors. *Id.* Finally, a "tertiary" or "third line" violation occurs when the "probable impact of the [price] discrimination ... [is] on the customers of either of [the favored or disfavored buyers]." *See Hasbrouck,* 496 U.S. at 558 n. 15, 110 S.Ct. 2535.[32]

---

**30.** Defendants appear to assume that "customers" in this context refer only to the purchasing public. This assumption appears unduly limited for reasons stated elsewhere. In summary, Plaintiffs also allege that they are "customers" under particular antitrust theories.

**31.** In the case at bar, to allege a primary-line violation, Plaintiffs would have to allege that Defendants' conduct harmed other producers of branded gasoline. *Id.* Plaintiffs do not do so.

**32.** A third or tertiary-line violation was explained by the Eighth Circuit as follows: "[A]lthough the purchasers of the discriminating seller do not compete directly, their customers compete within a unified market

As a prerequisite to establishing "competitive injury" in a secondary-line price discrimination case, a plaintiff must prove that "it was engaged in actual competition with the favored purchaser(s) as of the time of the price differential." *George Haug Co.*, 148 F.3d at 141 (quoting *Best Brands Beverage, Inc. v. Falstaff Brewing Corp.*, 842 F.2d 578, 584 (2d Cir.1987)).

The Supreme Court issued a significant ruling in *Texaco Inc. v. Hasbrouck* in 1990 to clarify what constitutes "actual competition" under the Robinson–Patman Act in secondary-line cases.[33] The *Hasbrouck* Court ruled that the notion that a seller's functional discounts (a discount to a particular category of buyer) are *per se* lawful is not tenable. *See* 496 U.S. at 563, 110 S.Ct. 2535[34]; *George Haug Co.*, 148 F.3d at 141–42. The existence of functional competition between competitors who may, at first blush, seem to compete on different levels

region." *Godfrey*, 161 F.3d at 1139; *see generally George Haug Co.*, 148 F.3d at 141 n. 2.

**33.** *Hasbrouck* involved facts similar to those at bar and thus is instructive in considering Plaintiffs' secondary-line claim. In *Hasbrouck*, Texaco sold gasoline to two distributors, Gull Oil Company ("Gull") and Dompier Oil Company ("Dompier"). *Id.* at 549, 110 S.Ct. 2535. Originally, Gull purchased gasoline at a lowest rate, because it sold unbranded Texaco gas under its own company label through various named stations. Dompier also received gasoline at a discounted price from Texaco, although not as low as Gull. Dompier re-sold its gasoline under the Texaco name. *Id.* at 549, 110 S.Ct. 2535. Both Gull and Dompier picked up Texaco's product at the Texaco bulk plant and delivered directly to retail outlets. *Id.* at 550, 110 S.Ct. 2535. Hasbrouck sold Texaco brand gasoline. The stations supplied by Dompier regularly sold at lower retail prices than independent stations supplied by Texaco directly, such as Hasbrouck. *Id.* at 550, 110 S.Ct. 2535. Dompier later entered the retail gasoline business, allegedly at Texaco's urging. *Id.* The plaintiffs in *Hasbrouck* were twelve independent Texaco retailers, who displayed the Texaco trademark, bought their gasoline directly from Texaco, and took delivery of their gasoline directly from Texaco. *Id.* at 548, 110 S.Ct. 2535. Texaco always charged a higher price to the plaintiffs than it charged to Gull or Dompier. *See id.*

The independent retail dealers brought a Robinson–Patman Act suit. Texaco defended its pricing by arguing that the wholesalers, Gull and Dompier, deserved lower prices because they rendered services to Texaco, *i.e.*, they earned "functional discounts." The Supreme Court analyzed "functional discounts" and ultimately affirmed the Ninth Circuit's endorsement of the district court's judgment based on a jury's finding that Texaco's differential pricing was illegal. The Supreme Court stated that:

The [Robinson–Patman] Act contains no express reference to functional discounts. It does contain two affirmative defenses that provide protection for two categories of discounts—those that are justified by savings in the seller's cost of manufacture, delivery, or sale, and those that represent a good faith response to the equally low prices of a competitor.

*Id.* at 555–56, 110 S.Ct. 2535 (footnotes omitted). The Court held that neither of these defenses was available to Texaco on the factual record before it. *Id.*

**34.** The Supreme Court adopted the explanation of the legal status of functional discounts set forth in the Report of the Attorney General's National Committee to Study the Antitrust Laws 208 (1955). *See Hasbrouck*, 496 U.S. at 560–61, 110 S.Ct. 2535. The Committee's explanation in pertinent part was:

The Committee recommends, therefore, that suppliers granting functional discounts either to single-function or to integrated buyers should not be held responsible for any consequences of their customers' pricing tactics. . . . The price cutting of a customer who receives this type of differential results from his own independent decision to lower price and operate at a lower profit margin per unit. The legality or illegality of this price cutting must be judged by the usual legal tests. In any event, consequent injury or lack of injury should not be the supplier's legal concern.

On the other hand, the law should tolerate no subterfuge. For instance, where a wholesaler-retailer buys only part of his goods as a wholesaler, he must not claim a functional discount on all. Only to the extent that a buyer actually performs certain functions, assuming all the risk, investment, and costs involved, should he legally qualify for a functional discount. Hence a distributor should be eligible for a discount corresponding to any part of the function he actually performs on that part of the goods for which he performs it.

*Id.* (quoting Report, at 208) (footnotes omitted).

is determined through a factual inquiry rather than a blanket legal rule. *See George Haug Co.*, 148 F.3d at 141–42 (citing *FTC v. Fred Meyer, Inc.*, 390 U.S. 341, 349, 88 S.Ct. 904, 19 L.Ed.2d 1222 (1968) (discussing § 2(d) of the Robinson–Patman Act, which has been interpreted similarly to § 2(a))).

■ Since *Hasbrouck*, a Robinson–Patman Act plaintiff must allege, and eventually prove, that *either* it competed on the same functional level (*i.e.*, as a wholesaler or retailer) with the allegedly favored buyer of the defendant's product *or,* if competing on a different functional level from the allegedly favored buyer(s), the plaintiff must prove that putative "functional discounts" offered by the defendant to the latter were in fact subterfuges to avoid the Robinson–Patman Act restrictions.[35] *See George Haug Co.*, 148 F.3d at 142.

In addition, a Robinson–Patman Act plaintiff must allege facts that "demonstrate a reasonable possibility that competition has been harmed as a result of the price differential." *Id.* (citing *Falls City Indus. v. Vanco Beverage, Inc.*, 460 U.S. 428, 434–35, 103 S.Ct. 1282, 75 L.Ed.2d 174 (1983), and *Corn Products Refining Co. v. FTC*, 324 U.S. 726, 742, 65 S.Ct. 961, 89 L.Ed. 1320 (1945)). There is a longstanding rule that "an injury to competition may be inferred from evidence that some purchasers had to pay their supplier 'substantially more for their goods than their competitors had to pay.'" *See Hasbrouck*, 496 U.S. at 559, 110 S.Ct. 2535 (quoting *Fed'l Trade Comm'n v. Morton Salt Co.*, 334 U.S. 37, 46–47, 68 S.Ct. 822, 92 L.Ed. 1196 (1948)). In the seminal case of *Morton Salt Co.*, the Supreme Court held that "the competitive opportunities of certain merchants were injured *when they had to pay respondent substantially more for their*

*goods than their competitors had to pay.* The findings are adequate [to support a claim of competitive harm]." *Morton Salt Co.*, 334 U.S. at 46–47, 68 S.Ct. 822 (emphasis added).

The Supreme Court altered this rule for cases involving primary-line violations of the Robinson Patman Act. *See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993). In *Brooke Group*, the plaintiff, a cigarette manufacturer, alleged that the defendant's volume rebates to wholesalers of generic cigarettes "amounted to price discrimination that had a reasonable probability of injuring competition." *Id.* at 216–17, 113 S.Ct. 2578. Plaintiff's theory in *Brooke Group* was that these volume discounts were nothing more than a predatory pricing scheme designed to eliminate plaintiff from the generic cigarette market. *Id.* at 217, 113 S.Ct. 2578. In support of its claim, the plaintiff offered proof that the defendant's scheme resulted in net prices for generic cigarettes that were below average variable costs. *Id.* at 217, 113 S.Ct. 2578.

The Supreme Court characterized the plaintiff's claim alleging harm to the seller's direct competitors to be a primary-line Robinson–Patman Act claim. *Id.* at 220, 113 S.Ct. 2578. In affirming the district court's grant of judgment as a matter of law for the defendant after a jury verdict for the plaintiff, the Supreme Court held that evidence of a price differential alone was insufficient to impose liability on the defendant on the primary-line price discrimination cause of action. *Id.* at 217, 113 S.Ct. 2578. The Court reiterated its longstanding skepticism toward predatory pricing claims brought by one manufacturer against another. *Id.* at 227, 113 S.Ct. 2578

**35.** Prior to *Hasbrouck,* the Second Circuit had held that in order to bring a secondary-line claim of price discrimination, a plaintiff must allege (and eventually show) that the defendant's price differential existed between entities competing "at the same functional level, *i.e.*, all wholesalers or all retailers, and within the same geographic market." *See Best*

*Brands Beverage, Inc. v. Falstaff Brewing Corp.*, 842 F.2d 578, 585 (2d Cir.1987). However, in *Hasbrouck,* the Supreme Court rejected the proposition that § 2(a) of the Clayton Act provided a safe harbor for any and all functional discounts. 496 U.S. at 563, 110 S.Ct. 2535; *see also George Haug Co.*, 148 F.3d at 142.

(citing *Matsushita Electric. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588–590, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ("[I]n *Matsushita,* we remarked on the general implausibility of predatory pricing.")). The Supreme Court concluded that the plaintiff's price fixing claim should not have gone to the jury since the plaintiff's allegation of harm to competition depended upon "a complex chain of cause and effect" that was unsupported by the trial record. *Id.* at 231, 113 S.Ct. 2578.

Several circuits have held that the *Morton Salt* inference is applicable in secondary-line price discrimination cases and limited the *Brooke Group* decision to primary-line cases. *See George Haug Co.*, 148 F.3d at 142–43; *Chroma Lighting v. GTE Products Corp.*, 111 F.3d 653, 658 (9th Cir. 1997); *Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.*, 79 F.3d 182 (1st Cir.1996); *Stelwagon Mfg. Co. v. Tarmac Roofing Systems, Inc.*, 63 F.3d 1267, 1271–75 (3d Cir.1995); *J.F. Feeser, Inc. v. Serv–A–Portion, Inc.*, 909 F.2d 1524, 1531 (3d Cir.1990), *cert. denied,* 499 U.S. 921, 111 S.Ct. 1313, 113 L.Ed.2d 246 (1991).[36] Defendants have not meaningfully challenged this proposition.

■ For the reasons set forth by the Second Circuit in *George Haug Co.* and the cases cited therein, this Court concludes that the Fifth Circuit would follow the lead of the First, Second, Third and Ninth Circuits on this issue. The Court therefore holds that the instant Plaintiffs must allege facts to support the proposition that "competitive injury" has occurred. This pleading burden is met if a Plaintiff alleges facts that "demonstrate a reasonable possibility that a price difference may harm competition." *J.F. Feeser, Inc.*, 909 F.2d at 1531.[37] "In keeping with the Act's prophylactic

**36.** The Second Circuit recently stated that in "*FTC v. Morton Salt Co.*, 334 U.S. 37, 49, 68 S.Ct. 822, 92 L.Ed. 1196 (1948), a secondary-line price discrimination case, the Supreme Court determined that the Robinson–Patman Act was 'especially concerned with protecting small business' and that therefore section 2(a) 'was intended to justify a finding of injury to competition by a showing of injury to the competitor victimized by the discrimination.' (quoting S.Rep. No. 1502, 74th Cong., 2d Sess. 4)." *George Haug Co.*, 148 F.3d at 142. The Fifth Circuit would appear to subscribe to this reasoning. In *M.C. Manufacturing Co. Inc., v. Texas Foundries, Inc.*, 517 F.2d 1059 (5th Cir.1975), the Fifth Circuit reversed a judgment awarded plaintiff on a secondary-line Robinson–Patman Act claim. *Id.* at 1061. The court of appeals held that the allegedly discriminatory sales were not made "in competition," and therefore, plaintiff's Robinson–Patman Act claim failed as a matter of law. *Id.* at 1066. The court went on, however, to state that:

Antitrust legislation is concerned primarily with the health of the competitive process, not with the individual competitor who must sink or swim in competitive enterprise. But as a necessary incident thereto, *it is concerned with predatory price cutting which has the effect of eliminating or crippling a competitor.* For surely there is *no more effective means of lessening competition* or creating monopolies than *the debilitation of a competitor.*

*Id.* at 1067–68 (quoting *Atlas Building Products Co. v. Diamond Block & Gravel Co.*, 269 F.2d 950, 954 (10th Cir.1959) (emphasis added)).

**37.** The Court notes a superficial inconsistency between the longstanding Third Circuit rulings in *J.F. Feeser, Inc.*, 909 F.2d at 1531, and *Stelwagon Mfg. Co.*, 63 F.3d at 1272, on the one hand, and a recent opinion by another panel in that Circuit in *Crossroads Cogeneration Corp. v. Orange & Rockland Utilities Inc.*, 159 F.3d 129, 141 (3rd Cir.1998), on the other hand. In *Crossroads Cogeneration,* the panel held that "to state a claim under the Robinson–Patman Act, a plaintiff must allege facts to demonstrate that (1) the defendant made at least two contemporary sales of the same commodity at different prices to different purchasers; and (2) the effect of such discrimination was to injure competition." *See Crossroads Cogeneration Corp.*, 159 F.3d at 141. The panel stated that a plaintiff must demonstrate that "the effect of such discrimination was to injure competition," and rather than stating that the requirement was proof that there is a "reasonable possibility" that competition was harmed, as provided by *Morton Salt.* However, *Crossroads Cogeneration* does not represent the appellate panel's conscious rejection of the earlier Third Circuit rulings in *J.F. Feeser, Inc.* or *Stelwagon Mfg. Co.*, that a Robinson–Patman Act claim is supportable upon proof of a substantial price discrimination between competitors over time and thus the application of *Morton Salt. See, e.g., Stelwagon Mfg. Co.*, 63 F.3d at 1272. The *Crossroads Cogeneration* opinion addressed the Robinson Patman Act claim only in a cursory manner. It did not cite *Stelwagon*

purpose, [designed to prevent the occurrence of price discrimination rather than to provide a remedy for its effects], section 2(a) does not require that the discrimination must in fact have harmed competition." *Id.* (citing *Falls City Industries,* 460 U.S. at 435, 103 S.Ct. 1282 (quoting *J. Truett Payne Co. v. Chrysler Motors Corp.,* 451 U.S. 557, 562, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981))).

■ *Analysis of Plaintiffs' Allegations.*—Plaintiffs, according to their Response intend to allege a "secondary-line" Robinson–Patman Act claim. *See* Plaintiffs' Response, at 18.[38]

As noted above, Plaintiffs in a secondary-line claim must allege the existence of a competitive relationship. Plaintiffs have generally alleged that Defendants have given unjustified and unlawful price differ-

entials to Defendants' direct customers for Shell gasoline, *viz.,* jobbers, jobber stations, and company-owned or operated stations.[39] Plaintiffs also generically allege that they suffer unlawful price discrimination because Defendants cannot justify a "functional discount" to the unnamed jobbers.[40] Plaintiffs thus apparently seek to attack the functional discounts that they believe Defendants grant to the jobbers who supply jobber stations or "open dealers".

The Court concludes that the sweeping allegations in the Plaintiffs' First Amended Complaint, despite initial appearances of adequacy, do not state a claim under the Robinson–Patman Act. This is not a class action. It is a case in which seventy-three different lessee-dealers from various states have elected to proceed in a single suit. The case must be analyzed from the per-

*Mfg.* (which gave detailed analysis to the issue of the applicability of the *Brooke Group Ltd.).* Indeed, *Crossroads Cogeneration* merely focused on the absence of any meaningful allegations by the plaintiff concerning the effect on competition.

Similarly, the Tenth Circuit's language in *Black Gold, Ltd. v. Rockwool Indus., Inc.,* 729 F.2d 676, 680 (10th Cir.1984), could be construed to conflict with the newer rulings cited in the text accompanying this footnote. However, the Tenth Circuit in *Black Gold Ltd.* emphasized that it had a unique circumstances before it (*Id.* at 681) and there was no need to address the effect on competition issues since they were not raised or implicated in the facts before that court. In any event, since the facts in *Black Gold, Ltd.* were materially different from those at bar, that holding is not persuasive authority in this case.

**38.** However, allegations in a response to a motion are not sufficient to amend the complaint. *See Shanahan v. City of Chicago,* 82 F.3d 776, 781 (7th Cir.1996). As indicated below, Plaintiffs are instructed that they must allege more precisely in a second amended complaint their theories of liability for each Plaintiff.

**39.** Plaintiffs allege that these discriminatory pricing practices cannot be overcome and "result[ ] in the substantial lessening of competition in the retail gasoline market and the substantial lessening of competition between Plaintiffs and the favored buyers" in violation

of the Robinson–Patman Act. Plaintiffs' First Amended Complaint, at 23, ¶ 159. Plaintiffs contend that as a result of the discriminatory pricing, the Plaintiffs' "ability to compete with Shell jobbers at the retail level has been impaired, resulting in lost sales and profits, as well as other damages, including being forced out of the Shell-branded gasoline market." *Id.* at 23, ¶ 160.

**40.** Plaintiffs allege that the

difference in price does not constitute a reasonable reimbursement for actual marketing functions performed by the jobbers. The jobbers are dual distributors, selling Shell gasoline both at the wholesale and retail levels, however, the substantially lower price given to jobbers greatly exceeds the value of the additional functions they perform. The added functions performed by the jobbers do not result in actual costs, legal risks and/or investments that would justify the deep discount enjoyed by the non-lessor retail stations.

Plaintiffs' First Amended Complaint, at 15, ¶ 119. Plaintiffs also allege that:

Shell has engaged in the practice of giving jobbers a substantial and preferential discount on the price of Shell gasoline. Shell jobbers purchase Shell gasoline at Shell terminals.... The rack price paid by Shell jobbers is substantially lower ... than the dealer tank wagon ("DTW") price charge by Shell to Shell Dealers.

Plaintiffs' First Amended Complaint, at 14, ¶ 111.

spective of each Plaintiff separately. Plaintiffs have not even attempted to meet their individual pleading burden.

Since there are dozens of Plaintiffs, each must make individual allegations in order for the parties to join issue and the Court to assess the viability of any given Plaintiff's claim. Plaintiffs will be given an opportunity to amend their complaint one more time. To satisfy their pleading obligations as to the Robinson–Patman Act claim, each Plaintiff must allege facts pertaining to each of the elements of this claim. These allegations should address at a minimum:

(i) the name and location of the source of the particular Plaintiff's Shell gasoline and, if known, the name and location of the source of gasoline acquired by the competing jobber, jobber-station, or company-owned station.

(ii) the type of Robinson–Patman Act violation that is alleged (i.e., primary, secondary, or tertiary, and whether there is a contention that Defendants use a functional discount as a subterfuge vis à vis the particular Plaintiff).

(iii) the identity and location of the particular jobber(s) and/or other retail station(s) that received an allegedly unlawful favorable price, the approximate price that jobber received (if known), and the approximate time period of the allegedly unlawful favorable treatment,

(iv) the geographic area in which the specific Plaintiff competes with each jobber or other station in issue as to that Plaintiff,

(v) what or how competition has or may have been injured as a result of the price discrimination suffered by that Plaintiff, and

While notice pleading is acceptable in an antitrust case, it is important for the parties to join issue on the actual controversy, Plaintiff by Plaintiff. Plaintiffs may not achieve through generalized pleadings the benefits of a class action when no class allegations are made or appropriate.

### 3. Robinson–Patman Act Claim Conclusion

The Court will not dismiss the Robinson–Patman Act claim as to any Plaintiff at this time. However, Plaintiffs shall file their second amended complaint on or before November 30, 1999, satisfying the foregoing pleading requirements and shall dismiss Plaintiffs who do not satisfy the jurisdictional requirement. Plaintiffs, in addition to any general allegations covering them as a group, must attach an appendix that includes—for each Plaintiff—the factual matters pertinent to that Plaintiff, as set forth in the preceding section of this opinion. Plaintiffs, in pleading their Robinson–Patman Act claims, may cross-reference as necessary new allegations included in their re-stated fraud and/or other causes of action as directed elsewhere in this opinion.

Only after each Plaintiff's Robinson–Patman Act claim is set forth in the second amended complaint will the Court rule definitively on the sufficiency of the allegations as to any single Plaintiff. Defendants' Motion to Dismiss Plaintiffs' Robinson–Patman Act claims therefore is **granted in part and denied in part** in accordance with this opinion.

### C. *Sherman Act § 1 Claim*

#### 1. Parties' Allegations and Contentions

In Count IV of Plaintiffs' First Amended Complaint, Plaintiffs allege a contract, combination, and/or conspiracy affecting interstate commerce, in violation of § 1 of the Sherman Act.[41] Plaintiffs allege that they have been forced by Defendants to pay a higher price for wholesale gasoline

---

**41.** Section 1 of the Sherman Act provides:
Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal.
15 U.S.C. § 1.

than certain jobbers who operate Shell brand[42] stations and Shell-owned stations. This higher price allegedly is the result of a conspiracy between Defendants and jobbers to restrain trade in an anti-competitive manner.[43]

Defendants argue that Plaintiffs have failed to state a claim under § 1 of the Sherman Act. Defendants contend that Plaintiffs allege a vertical restraint on trade by a manufacturer that is governed by the rule of reason analysis. Plaintiffs' claim does not, Defendants emphasize, involve any horizontal restriction or any vertical agreement to set or maintain prices Defendants' alleged conspiracy, therefore, is not *per se* unlawful. Defendants further argue that, under a rule of reason analysis, Plaintiffs have failed to define a legally cognizable product market for Plaintiffs' Sherman Act § 1 claims. Therefore, Defendants contend the Sherman Act § 1 claim must be dismissed.

### 2. Legal Framework

*General Legal Principles.*—Section 1 of the Sherman Act states that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce ... is hereby declared to be illegal." 15 U.S.C. § 1. In order to state a claim for a violation of § 1, a plaintiff must allege (1) the existence of a conspiracy (2) affecting interstate commerce (3) that imposes an "unreasonable"

restraint of trade. *See Dillard v. Merrill Lynch, Pierce, Fenner, & Smith Inc.*, 961 F.2d 1148, 1158 (5th Cir.1992) (citing *White & White v. Am. Hosp. Supply Corp.*, 723 F.2d 495, 504 (6th Cir.1983)).

There are two possible theories for a Sherman Act § 1 violation. *Per se* violations of § 1 involve those "agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable...." *United States v. General Motors Corp.*, 384 U.S. 127, 146, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966). *Per se* violations are held to be illegal without any inquiry into the actual effect on the relevant market. *Id.; see also Klor's v. Broadway–Hale Stores, Inc.*, 359 U.S. 207, 211, 79 S.Ct. 705, 709, 3 L.Ed.2d 741 (1959). If a violation is not *per se* illegal, it is analyzed according to the rule of reason. *See Jayco Systems v. Savin Business Machines Corp.*, 777 F.2d 306, 317 (5th Cir. 1985); *Red Diamond Supply, Inc. v. Liquid Carbonic Corp.*, 637 F.2d 1001, 1004 (5th Cir.1981) (citing *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 58–59, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977)); *accord Smalley & Co. v. Emerson & Cuming, Inc.*, 13 F.3d 366, 368 (10th Cir.1993); *Illinois Corp. Travel, Inc. v. American Airlines, Inc.*, 889 F.2d 751, 753 (7th Cir.1989).

█ In order to determine whether a particular conspiracy is illegal *per se*, the

---

**42.** At the Court's September 24, 1999 hearing, counsel for Plaintiffs agreed with the Court's statement that Count IV of Plaintiffs' complaint alleged discrimination among retail sellers of Shell gasoline. *See* Transcript of September 24, 1999 conference [Doc. # 50], at 18–19.

**43.** Plaintiffs allege a simple outline of a conspiracy. First, Plaintiffs allege:

> Shell and certain "favored dealers" and jobbers have entered into agreements in which Shell uses discriminatory pricing practices to charge higher prices for gasoline to Plaintiffs than to these "favored" dealers and jobbers.

Plaintiffs' First Amended Complaint, at 23, ¶ 164; at 25 ¶¶ 175, 176. Plaintiffs also allege in their Amended Complaint that: "Be-

ginning at least in 1995 and continuing to the present, Shell has engaged in the practice of giving jobbers a substantial and preferential discount on the price of Shell gasoline." *Id.* at 14, ¶ 111. Plaintiffs then allege "on information and belief," that "Shell and its jobbers have entered into agreements regarding the price to be charged Plaintiffs, so as to exclude Plaintiffs from purchasing fuels at competitive wholesale prices." *Id.* at 23, ¶ 165. Plaintiffs add that "[j]obbers consistently refuse to sell Shell branded gasoline to Plaintiffs, apparently either by agreement with Shell or upon fear of retaliation by Shell." *Id.* at 16, ¶ 121. Thereafter, Plaintiffs allege that these alleged agreements between Shell and its jobbers "restrain trade in an anti-competitive manner." *Id.* at 25, ¶ 176.

Court must determine whether it represents a horizontal or a vertical restraint of trade. *See Red Diamond Supply, Inc.,* 637 F.2d at 1004. If the alleged conspiracy is horizontal, it is *per se* illegal and Plaintiffs need not allege market effects. *Id.* (citing *GTE Sylvania, Inc.,* 433 U.S. at 58 n. 28, 97 S.Ct. 2549). On the other hand, if the alleged conspiracy is vertical, then generally it should be analyzed under the rule of reason. *Id.*

There is an exception, however, to the general rule that vertical restraints be analyzed under the rule of reason. The Supreme Court has generally held that vertical restraints involving price maintenance or price levels are *per se* illegal. *See NYNEX Corp. v. Discon, Inc.,* 525 U.S. 128, 119 S.Ct. 493, 498, 142 L.Ed.2d 510 (1998) (quoting *Business Electronics Corp. v. Sharp Electronics Corp.,* 485 U.S. 717, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988) ("vertical restraint is not illegal *per se* unless it includes some agreement on price or price levels")); *GTE Sylvania,* 433 U.S. at 52 n. 18, 97 S.Ct. 2549 ("we are concerned here only with nonprice vertical restrictions. The *per se* illegality of price restrictions has been established firmly for

many years and involves significantly different questions of analysis and policy").[44]

■ ***Vertical or Horizontal Restraint Analysis.***—Plaintiffs allege a conspiracy by Defendants and the jobbers to drive Plaintiffs out of the retail gasoline market through Defendants' discriminatory pricing between the jobbers and Plaintiffs.[45]

Plaintiffs' First Amended Complaint contains no allegations of conspiratorial activity by Plaintiffs' retail competitors (jobber stations, open dealers or company-owned stations). *See Cernuto, Inc. v. United Cabinet Corp.,* 595 F.2d 164 (3d Cir.1979).[46] Nor is there any allegation that the decisions to set allegedly discriminatory prices originated with Plaintiffs' retail competitors, the jobbers or jobber stations. Plaintiffs do not allege that any of Plaintiffs' retail competitors were involved in the wholesale gasoline pricing decisions or had any agreements concerning Plaintiffs. Nor do Plaintiffs allege that jobbers have made agreements among themselves about pricing of gasoline at their retail stations. Throughout Plaintiffs' First Amended Complaint, Plaintiffs refer to agreements between Shell and its "jobbers."[47] Accordingly, the Court concludes

---

**44.** This *per se* rule does not extend to sellers' imposition of maximum prices on their distributors. *See State Oil Co. v. Khan,* 522 U.S. 3, 118 S.Ct. 275, 282, 139 L.Ed.2d 199 (1997) (overruling *Albrecht v. Herald Co.,* 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968), which held that vertical maximum price restrictions were *per se* illegal). Claims involving vertical maximum price restrictions are now analyzed under the rule of reason. *Id.* at 285.

**45.** To the extent that Plaintiffs attempt to allege that agents and officers of Shell conspired with Shell, their claim fails as a matter of law. *See Domed Stadium Hotel, Inc. v. Holiday Inn–Superdome, Inc.,* 732 F.2d 480, 486 (5th Cir.1984) ("a point well established in this circuit is that a corporation cannot conspire or combine with its own officers, employees, or wholly owned sales divisions and outlets in violation of section one"); *accord Crosby v. Hosp. Authority of Valdosta and Lowndes,* 93 F.3d 1515, 1526 (11th Cir.1996).

**46.** In *Cernuto,* a manufacturer of cabinets decided to discontinue its supply to plaintiff, a

retail cabinet outlet (Cernuto). *Id.* at 165. Cernuto alleged that the manufacturers' decision was based on a request by one of its retail competitors. This competitor allegedly complained because plaintiff sold cabinets for a substantially lower price. In finding that the restraint fell under the *per se* rules, the Third Circuit stated that:

> When a manufacturer acts of its own, in pursuing its own marketing strategy, it is seeking to compete with other manufacturers by imposing what may be defended as reasonable vertical restraints.... However, if the action of a manufacturer or other supplier is taken *at the direction of its customer,* the restraint becomes primarily horizontal in nature in that one customer is seeking to suppress its competition by utilizing the power of a common supplier.

*Id.* at 168 (emphasis added).

**47.** In fact, Plaintiffs' pleadings indicate that the pricing policy originated with Defendants, as Plaintiffs state that "[j]obbers consistently refuse to sell Shell brand gasoline to Plaintiffs, apparently either by agreement with

that Plaintiffs allege a vertical restraint concerning Defendants' pricing and distribution policies. Plaintiffs' claim thus must be analyzed under the rule of reason.[48]

To the extent Plaintiffs also seek to allege that Defendants discriminate in price between the wholesale gasoline prices offered to the company-owned stations as compared to the gasoline prices available to Plaintiffs, this too is a vertical price restraint. Plaintiffs have alleged that the Shell-owned stations must acquire the product and act as retailers. They thus indicate that there is a transfer of ownership of the gasoline between levels in the distribution chain.

Even if Plaintiffs do not intend to suggest that such a transfer occurs with respect to the company-owned dealers, the result is the same. The Fifth Circuit has held that "[w]hen the manufacturer is the source, the conspiracy is vertical," even if the manufacturer also sells directly to the consumer. *Red Diamond Supply, Inc.,* 637 F.2d at 1004. The court of appeals stated:

> When a producer elects to market its good through distributors, the latter are not, in an economic sense, competitors of the producer even though the producer also markets some of its goods itself; rather, the distributors are "agents" of the producer, employed because the pro-

ducer has determined that it can supply its goods to consumers more efficiently by using distributors than it can by marketing them entirely by itself.

*Id.* at 1005. Thus, Plaintiffs' allegations concerning Defendants' pricing to company-owned stations fall within the prior conclusion that Plaintiffs have failed to allege any horizontal conspiracy.[49]

***No Price–Fixing or Price Maintenance Allegations to Require Per Se Standard.***—Plaintiffs have failed to allege facts that would bring this case within the price fixing or price maintenance exception to the general rule that vertical restraints are analyzed under the rule of reason. Plaintiffs' First Amended Complaint does not allege a conspiracy to *set* prices. *See Orson, Inc. v. Miramax Film Corp.,* 79 F.3d 1358, 1368 (3d Cir.1996) (citing *Business Electronics Corp. v. Sharp Electronics Corp.,* 485 U.S. 717, 724, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988) ("[T]he Supreme Court has instructed that vertical restraints of trade, which do not present an express or implied agreement to set resale prices, are evaluated under the rule of reason.")). Plaintiffs, retail dealers, complain that there is an improper differential between the wholesale prices Defendants charge to jobbers as compared to the prices Defendants charge to Plaintiffs for their gasoline supply.[50] There are no alle-

---

Shell *or upon fear of retaliation* by Shell." Plaintiffs' First Amended Complaint, at 16, ¶ 121

**48.** This lack of involvement by retail competitors distinguishes this case from those cases cited by Plaintiffs, *Klor's* and *General Motors.* In *Klor's,* the parties did not contest the fact that the boycott was brought at the suggestion of the plaintiff's retail competitor. *See Klor's,* 359 U.S. at 209, 79 S.Ct. 705 ("Broadway Hale [plaintiff's retail competitor] has used its 'monopolistic' buying power to bring about this situation."). Likewise, in *General Motors,* the competing retail dealers complained to the manufacturer about their competitor's use of discounted retail prices. *See General Motors,* 384 U.S. at 133, 86 S.Ct. 1321.

**49.** This conclusion is consistent with the maxim that "antitrust law shows more concern to protect inter rather than intrabrand competi-

tion." *Bogan v. Hodgkins,* 166 F.3d 509, 515 (2d Cir.1999) (citing *NYNEX Corp. v. Discon, Inc.,* U.S. 525 U.S. 128, 119 S.Ct. 493, 497–500, 142 L.Ed.2d 510 (1998)). *Accord Jayco Systems, Inc.,* 777 F.2d at 320 n. 48 (finding that plaintiff failed to demonstrate an anticompetitive effect on interbrand competition).

**50.** Plaintiffs also complain in passing in their Sherman Act § 1 claim about the ICR policy. *See* Plaintiffs' First Amended Complaint, at 26, ¶ 179. For this allegation to be consistent with the rest of Plaintiffs' claims in Count IV, Plaintiffs would have to allege that the retail stations with whom they compete are not saddled with this allegedly cumbersome tying agreement. Plaintiffs have not made any such allegations.

gations that Defendants directly sought to influence the jobbers' resale prices or the retail price of gasoline at jobber stations.[51] Plaintiffs have not alleged a claim of unlawful setting or maintaining of retail prices by a manufacturer, and therefore there is no legal basis for a *per se* analysis.[52] The rule of reason must be applied in this case.

### Application of the Rule of Reason.

—The Court further concludes that Plaintiffs have not made sufficient allegations to state a claim under the Sherman Act § 1 rule of reason analysis. To prove a Sherman Act § 1 conspiracy violation under rule of reason analysis, Plaintiffs must show that Defendants' activities caused an "injury to competition." *See Doctor's Hosp. of Jefferson, Inc. v. Southeast Medical Alliance, Inc.*, 123 F.3d 301, 307 (5th Cir.1997) (citing *Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*, 28 F.3d 1379, 1385 (5th Cir.1994)); *see also Red Diamond Supply, Inc.*, 637 F.2d at 1005 (holding that plaintiff must demonstrate that defendant's conduct "has an adverse effect on competition"). A key element of any rule of reason analysis, therefore is a definition of the appropriate product and geographic markets. *Cf. Doctor's Hosp. of Jefferson*, 123 F.3d at 307.

Failure to define a legally cognizable market is usually fatal to a § 1 conspiracy claim. *See Bogan*, 166 F.3d at 516; *Jayco Systems, Inc.*, 777 F.2d at 320. Plaintiffs assert two theories in an effort to define a relevant product market. First, Plaintiffs argue that the relevant product market from the retail consumer's perspective is Shell gasoline. *See* Plaintiffs' First Amended Complaint, at 24, ¶ 166. Alternatively, Plaintiffs argue that the product

market is Shell brand gasoline "from the perspective of independent Shell dealers." *See id.* at 24, ¶ 167.

Courts generally employ the cross-elasticity method of determining relevant product markets. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962); *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 404, 76 S.Ct. 994, 100 L.Ed. 1264 (1956); *see also Jayco Systems, Inc.*, 777 F.2d at 319 (applying the *Brown Shoe* analysis to a § 1 conspiracy claim). Under this method, a product market is defined as the product at issue and all other "commodities reasonably interchangeable by consumers for the same purposes." *See Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 487 (5th Cir.1984) (quoting *E.I. du Pont de Nemours & Co.*, 351 U.S. at 395, 76 S.Ct. 994); *accord R.D. Imports Ryno Industries, Inc. v. Mazda Distributors (Gulf), Inc.*, 807 F.2d 1222, 1224 (5th Cir.1987).

The Court concludes that Plaintiffs have failed to allege a legally cognizable market. From the retail gasoline consumers' perspective, a single product brand generally cannot constitute a relevant market, even if that product bears a trademark. *See Town Sound and Custom Tops*, 959 F.2d at 479. This is true of branded gasoline. *See* discussion *supra* at 641–42.

Plaintiffs' attempt to define a product market from their dealer perspective also lacks merit. Generally, in order to define a relevant market under the Sherman Act § 1, a plaintiff must refer to the lack of product interchangeability. *See Global Discount Travel Services, L.L.C. v. Trans World Airlines, Inc.*, 960 F.Supp. 701, 704

**51.** In fact, Plaintiffs allege that, "The jobber stations sell gasoline to the public at a lower price than the lessee-dealers can sell their gasoline because of the lower price jobber stations pay Shell for the gasoline." Plaintiffs' First Amended Complaint, at 14, ¶ 112. Later, Plaintiffs state "Shell sells gasoline to the public at company-owned stations at retail prices which are at times lower than the dealers' 'break even' price." *Id.* at 16, ¶ 122. If anything, the net effect of these allegations

is that Defendants' scheme has resulted overall in a lowering of retail prices, not anticompetitive conduct resulting in the raising of prices.

**52.** If anything, Defendants' actions resemble an attempt to set the maximum retail price of Plaintiffs' retail competitors. Vertical agreements to set maximum prices are no longer *per se* illegal. *See supra,* note 47.

(S.D.N.Y.1997) ("Plaintiff's failure to define its market by reference to the rule of reasonable interchangeability is, standing alone, valid grounds for dismissal."). In their First Amended Complaint, Plaintiffs argue that they cannot purchase brand name gasoline from any source other than Shell. Plaintiffs do not meaningfully allege, however, that the lack of alternatives results from the absence of close substitutes interchangeable with Shell gasoline. To the extent Plaintiffs do allege that Shell gasoline is a unique product, the uniqueness stems primarily from Plaintiffs' contracts with Defendants to distribute Shell gasoline. Thus, Plaintiffs' proposed product market definition is a creation of contractual provisions, not market realities. Indeed, other than these contractual limits arising from Plaintiffs' status as Shell dealers, Plaintiffs' alternative definition of a relevant market—Shell gasoline—is no different from the retail consumer-based definition, and suffers from the same insufficiency. The Court therefore concludes that Plaintiffs have failed to allege a legally cognizable relevant product market to satisfy the standards set forth in *Brown Shoe* and *du Pont.*

Plaintiffs thus do not allege a viable Sherman Act § 1 conspiracy; Plaintiffs have not alleged a legally cognizable relevant product market against which to measure the competitive effect of Defendant's alleged conspiracy. Plaintiffs' § 1 conspiracy claim accordingly fails as a matter of law.

### D. *Required Amendments by Plaintiffs to their Complaint*

Based on the foregoing rulings, Plaintiffs are directed to file a second amended complaint. This pleading shall clarify Plaintiffs' claims as directed throughout this opinion. Specifically, but without limitation, Plaintiffs' second amended complaint must contain, to the extent possible under Rule 11 of the Federal Rules of Civil Procedure, the following:

(i) the name and location of the source of the particular Plaintiff's Shell gasoline and, if known, the name and location of the source of gasoline acquired by the competing jobber, jobber-station, or company-owned station.

(ii) the type of Robinson–Patman Act violation that is alleged (*i.e.,* primary, secondary, or tertiary, and whether there is a contention that Defendants use a functional discount as a subterfuge vis à vis the particular Plaintiff),

(iii) the identity and location of the particular jobber(s) and/or other retail station(s) that received an allegedly unlawful favorable price, the approximate price that jobber received (if known), and the approximate time period of the allegedly unlawful favorable treatment,

(iv) the geographic area in which the specific Plaintiff competes with each jobber or other station in issue as to that Plaintiff,

(v) what or how competition has or may have been injured as a result of the price discrimination suffered by that Plaintiff *or* other antitrust violation, and

(vi) for each Plaintiff separately, detailed allegations of the allegedly fraudulent statements or conduct by Defendants as to that Plaintiff.

## IV. *CONCLUSION*

Based on the reasons discussed above, the Court concludes that Defendants' Motion to Dismiss Plaintiffs Tying and Price Discrimination Claims [Doc. # 11] has merit concerning the Sherman Act § 1 and Clayton Act § 3 tying claims pleaded by Plaintiffs in Counts I and II of Plaintiffs' First Amended Complaint, and these claims should be dismissed. The Court concludes that Defendants' Supplemental Motion [Doc. # 46] has merit as to the Sherman Act § 1 conspiracy claim pleaded by Plaintiffs in Count IV of Plaintiffs' First Amended Complaint, and that claim also should be dismissed. Defendants' Motion

has merit as to the Robinson–Patman Act claim since Plaintiffs jointly have presently attempted to plead that claim. But, dismissal of the entire Robinson–Patman Act claim for all Plaintiffs is premature. Each Plaintiff is granted the right to re-plead this claim before the sufficiency of his or her allegations can be evaluated. It is therefore

ORDERED that Defendants' Motion to Dismiss Plaintiffs Tying and Price Discrimination Claims [Doc. # 11] is **GRANTED as to Plaintiffs' tying claims alleged in Counts I and II of the Plaintiffs' First Amended Complaint.** It is further

ORDERED that Defendants' Motion to Dismiss Plaintiffs Tying and Price Discrimination Claims [Doc. # 11] is **GRANTED in part and DENIED in part as to the Robinson–Patman Act claim alleged in Count III of Plaintiffs' First Amended Complaint.** Plaintiffs are granted leave to file a second amended complaint with the necessary appendix setting forth each Plaintiff's claim specifically as directed in this opinion. It is further

ORDERED that Defendants' Supplemental Motion to Dismiss Plaintiffs' Conspiracy Count [Doc. # 46] is **GRANTED.** It is further

ORDERED that Plaintiffs are granted leave to re-plead their tying and conspiracy claims if feasible under Rule 11 in light of this opinion. It is finally

ORDERED that Plaintiffs' Second Amended Complaint must be filed on or before November 30, 1999.